COMMONWEALTH *vs.* EMMETT L. SNOW.

No. 91-P-855.

Suffolk. October 13, 1992. - January 25, 1993.

Present: KASS, JACOBS, & GREENBERG, JJ.

*Homicide. Joint Enterprise. Intent. Practice, Criminal,* Instructions to jury, Opening statement.

At a criminal trial in which the defendant was found guilty of second degree murder on a joint venture theory, the judge correctly refused to instruct the jury with regard to involuntary manslaughter, where the defendant's version of the events surrounding the stabbing of the victim in an affray provided no basis to support the defendant's hypothesis that an involuntary manslaughter instruction was warranted. [30-33]

Evidence at a murder trial was sufficient to permit the jury to find the defendant guilty of murder in the second degree, on a joint venture theory, in the stabbing of the victim during an affray. [33-34]

The prosecutor's opening statement at a criminal trial was adequately supported by the evidence and presented no occasion for a mistrial. [34-35]

INDICTMENT found and returned in the Superior Court Department on October 13, 1988.

The case was tried before *John J. Irwin, Jr.,* J., and a motion for a new trial was considered by him.

*Willie J. Davis* for the defendant.

*Vincent R. McDonough,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. This case illustrates the all too familiar and tragically recurring scenario of urban teenagers engaged in a rumble that results in death. On October 13, 1988, a Suffolk County grand jury returned an indictment charging the defendant, eighteen year old Emmett Snow, with murder in the first degree for the stabbing of sixteen year old Richard Bailey, sometimes known as "Poyo." On September 28, 1989, a jury found the defendant guilty on a joint venture

theory of murder in the second degree.[1] The primary conten-
tion of the appeal is that the judge erred in refusing to in-
struct the jury on involuntary manslaughter. We affirm the
conviction.

Based on the testimony of several witnesses, the jury could
have believed that on August 26, 1988, Richard Bailey
(Poyo) had a fist fight with Jermaine Coakley, a friend of the
defendant. On the very next afternoon, between 2:00 P.M.
and 3:30 P.M., Poyo and several of his friends were seen talk-
ing to the defendant near a neighborhood variety store on
Copeland Street. As the defendant left the group, he yelled
back at them, "You'll get yours! You'll get yours!" Then,
both he and Poyo walked away in opposite directions with
"smiles on their faces." The defendant was also heard to say,
"This whole block's gonna be lit up tonight." Upon being
asked by an onlooker, "Why do you have to bring guns into
it?" the defendant replied, "Who said anything about guns?"

That night, Poyo and a group of his friends, about eight in
all, were seated on a fence with their backs facing the en-
trance to the Warren Gardens housing complex. The fence
bordered that project and was located between two walls.
Around 7:30 P.M., about ten to fifteen young men (the War-
ren Gardens group) were seen climbing over the walls and
making their way through the alleys from Warren Gardens
towards the group on the fence. The Warren Gardens group
consisted of the defendant, Earl Dickerson, Chris and Deme-
trius Dunston, Jermaine Coakley, and several others. Several
of these boys were carrying sticks and canes. The defendant
was walking at the front of the pack. One of the boys spotted
the Warren Gardens group coming closer, so they headed
away from the area and toward Copeland Street, some run-
ning, some walking fast. Someone from the Warren Gardens
group pointed at the running boys and said, "There they go,"
and the Warren Gardens group started chasing after the flee-
ing boys.

---

[1] The defendant was convicted pursuant to G. L. c. 265, § 1.

The defendant was in the lead and running after Poyo. Neither the defendant nor Poyo had anything in his hand. The defendant, being the first to reach Poyo, grabbed him, the two exchanged punches, and Poyo was tripped to the ground. About five boys from the Warren Gardens group, some having sticks and canes, then descended on the victim and started to "beat up on him."

Poyo's younger sister bravely approached the group that was attacking her brother and began wildly throwing the attackers off of him. The defendant, who had been kneeling over Poyo, was the last to leave him. As the Warren Gardens group was running back toward their turf, someone yelled, "I got Poyo, man. I got Poyo." Immediately after this attack, the defendant was seen sitting over on the fence by Warren Gardens with his girlfriend.

Poyo was eventually transported to Boston City Hospital, where he died.

An autopsy revealed that Poyo died from a knife wound to the chest that penetrated the body and went in six inches. Based on the fact that the knife perforated the cartilage, the coroner concluded that Poyo was stabbed with considerable force. He also had a contusion over the left eye caused by a blunt instrument or surface, possibly a cane. This blow, however was not life-threatening and did not contribute to his death. No other contusions were found on his body.

No one could clearly see what happened during the critical part of the affray. As a result, how the stabbing actually occurred was the subject of conflicting testimony.[2] Since the defendant's argument primarily is that an involuntary manslaughter charge should have been given, along the lines recommended in *Commonwealth* v. *McCauley*, 355 Mass. 554,

---

[2]One witness testified that the defendant pulled out the knife, handed it to Earl Dickerson and said, "Earl you got the knife, you know what to do with it." After Earl Dickerson stabbed Poyo, the defendant twisted the knife and pulled it out. Other witnesses testified that Earl Dickerson alone stabbed Poyo, and they did not see anything in the defendant's hands. There was testimony that as Poyo was dying he declared, "Get Emmett, Emmett's the one who stabbed me." Others testified that after the attack the defendant was the one yelling, "I got Poyo, I got Poyo."

561 (1969), we adopt the view of the evidence most favorable to the defendant. The jury could reasonably have inferred that the defendant did not strike Poyo again but remained within the ambit of those beating the victim. As matters transpired, it appears (from the verdict slip on which the jury indicated they found the defendant acted as a joint venturer in the murder) that the jury did conclude that Poyo was stabbed by Earl Dickerson and not the defendant.

1. *Involuntary manslaughter instruction.* The defendant's position at trial was that he was entitled to an instruction defining involuntary manslaughter.[3] Even though the defendant's defense was that he played no role in the beating of Poyo, this "does not relieve the judge from giving an [involuntary] manslaughter charge . . . where the evidence would warrant a conviction of that lesser crime." *Commonwealth* v. *Walden*, 380 Mass. 724, 726-727 (1980), and cases cited. In a murder prosecution, the judge is required to give a charge concerning this lesser included offense if any rational view of the evidence, without regard to its ultimate credibility, will permit a finding that the offense was involuntary manslaughter. See *Commonwealth* v. *Freeman*, 407 Mass. 279, 285 (1990). See also *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987), and cases cited. However, "[e]ven when evidence is introduced that would justify a conviction for a lesser included offense, the defendant is not entitled to an instruction thereupon unless proof on the 'elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense.'" *Commonwealth* v. *Egerton*, 396 Mass. 499, 504 (1986). See also *Commonwealth* v. *Walden, supra*, at 727; *Commonwealth* v. *Martinez*, 393 Mass. 612, 613-614 (1985). In fact, it would be error to give an involuntary manslaughter charge without some supporting evidence of the commission of that crime. *Commonwealth* v. *Walden, supra.*

---

[3]The judge instructed on voluntary manslaughter, as well as first and second degree murder, but declined to instruct the jury on the elements of involuntary manslaughter as requested by defense counsel.

These principles apply here. The defendant elected not to testify on his own behalf, but his account of the matter, as stated in the testimony of his girlfriend and his sister, was that he was present at the scene — completely uninvolved in the affray. This version of the events, had the jury opted to believe their testimony, might have resulted in his being found not guilty of the principal charge, but it failed to provide any basis to support the defendant's hypothesis that an involuntary manslaughter instruction was called for. Contrast *Commonwealth* v. *Campbell*, 352 Mass. 387, 397-398 (1967). Here, no view of the evidence would have justified a charge of involuntary manslaughter predicated on the theory of joint venture.

Since the trial of this case, involuntary manslaughter has been defined as an "unintentional death (1) during the commission of wanton or reckless conduct as defined in *Commonwealth* v. *Welansky*, [316 Mass. 383, 400 (1944)], or (2) during the commission of a battery, under the principles set forth in *Commonwealth* v. *Sheppard*, [404 Mass. 774, 776 (1989)], and other cases cited therein." *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990). See also *Commonwealth* v. *Sneed*, 413 Mass. 387 (1992). The defendant submits that the jury could have found that as a joint venturer he had only the intent to commit simple assault and battery which resulted in death, but not the requisite intent to commit murder, thus amounting to involuntary manslaughter. And so, the argument goes, the judge should have given the jury the option by giving the requested charge. The flaw in this argument is that the defendant focuses solely on his own conduct. Under a joint venture theory, other factors are open for examination to determine a defendant's intent. Nothing resembling simple assaultive behavior occurred in the instant case.

Under the case law defining joint venture, a defendant may be accountable for the actions of the principal if the defendant was (1) present at the scene of the crime, (2) with *knowledge* that another intends to commit a crime, and (3) by agreement is willing and available to help the

other if necessary. *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). *Commonwealth* v. *Bianco*, 388 Mass. 358, 366 (1983). *Commonwealth* v. *Stewart*, 411 Mass. 345, 358-359 (1991). "For joint venturer criminal liability, the defendant's knowledge requirement is satisfied by his or her knowledge that there is a substantial likelihood that the crime will be committed by [another] person." *Commonwealth* v. *Walsh*, 407 Mass. 740, 743 (1990), and cases cited. So, in determining intent, the focus is not only on the defendant's conduct but also on his knowledge of the circumstances before and at the time of the beating.

Thus, based on the case law, the defendant could have been found guilty of involuntary manslaughter on a joint venture theory if the evidence demonstrated that the defendant anticipated that only a simple assault and battery was to be committed by the participants and if he had no knowledge that it would escalate into the use of a dangerous weapon on the victim.[4] See *Commonwealth* v. *Cunningham*, 405 Mass. 646 (1989) (evidence sufficient to find defendant guilty of involuntary manslaughter where defendant thought the principal was only going to commit a simple assault and battery, but principal stabbed the victim).

Crediting as we must the defendant's version of the events, it remains an inescapable conclusion that the defendant knew an assault and battery with a dangerous weapon was about to be committed. The defendant's comment, "You'll get yours" directed at the victim and his friends indicated he knew a fight was going to break out. If the defendant did not

---

[4]The defendant does not argue that the stabbing itself was the result of wanton or reckless conduct, as defined in the *Welansky* case, 316 Mass. at 400. In fact, no evidence was presented at trial that the stabbing was unintentional. See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 246 (1981). Compare *Commonwealth* v. *Sowell*, 22 Mass. App. Ct. 959, 963 (1986) (involuntary manslaughter instruction not required where the knife produced a deep stab wound penetrating the fleshy portion of the upper thigh to the bone), with *Commonwealth* v. *Hinckley*, 1 Mass. App. Ct. 195, 200 (1973) (evidence sufficient to justify involuntary manslaughter charge where defendant opened door and immediately thrust knife out hitting victim in the chest).

know about the knife,[5] he was aware before and during the beating that other participants had sticks and canes. He remained in the circle of attackers while others beat the victim, tried to tie the victim with a rope, and eventually stabbed him. Finally, the defendant was the last person to get off of the victim.

Given the testimony of this nature of intentional conduct, the judge's view that the evidence did not warrant the requested instruction was justified. *Commonwealth v. Sneed*, 413 Mass. at 393 & n.4 (in addition to wanton and reckless conduct, another aspect of involuntary manslaughter concerns an unlawful homicide, unintentionally caused in the commission of a battery not amounting to a felony, citing *Commonwealth v. Sheppard*, 404 Mass. 774). Furthermore, the use of dangerous weapons such as sticks and canes is likely to endanger life and is not consistent with unintentional, merely reckless behavior. See *Commonwealth v. Hicks*, 356 Mass. 442, 445 (1969). Compare *Commonwealth v. Hinckley*, 1 Mass. App. Ct. 196, 200-201 (1973).

Additionally, since there was not a shred of evidence that the defendant had no knowledge of the weapon which ultimately was used to inflict the fatal wound, the judge correctly denied the defendant's request. Compare *Commonwealth v. Gould*, 413 Mass. 707, 715 (1992), quoting from *Commonwealth v. Santo*, 375 Mass. 299, 305-306 (1978) (no such instruction is necessary, and need not be sought by trial counsel, when the evidence provides no "rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offense").

2. *Motion for required finding.* The trial judge properly denied the defendant's motion for a required finding of not guilty under a joint venture theory of murder. Evidence will be deemed sufficient to convict a person of a crime if, "after

---

[5]From the evidence presented, it is questionable whether the jury could have inferred that the defendant did not know of the knife. Contrast *Commonwealth v. Yunggebauer*, 23 Mass. App. Ct. 46, 50 (1986) (instruction on simple assault and battery should have been given where defendant specifically testified to her lack of knowledge of the principal's possession of or intent to use a pipe and a knife on the victim).

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979) (emphasis in original). *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989). To sustain a conviction on the theory of joint venture, the Commonwealth must show that the defendant "intentionally assisted . . . in the commission of the crime and that he did this, sharing with [the principal] the mental state required for that crime." *Commonwealth* v. *Hennessey*, 17 Mass. App. Ct. 160, 162 (1983), and cases cited. The evidence of the defendant's participation was sufficient to deem him a joint venturer in the murder. Evidence was presented that, after the victim was surrounded, the defendant said to Earl Dickerson, "Earl, you have the knife, you know what to do with it," whereupon Earl stabbed the victim. Also, one witness testified that the defendant twisted the knife while it was in the victim, he pulled it out, and, as he left the victim, he yelled, "I got Poyo." Finally, before dying, Poyo declared, "Get Emmett, Emmett stabbed me." This evidence warranted a jury finding the defendant guilty of second degree murder as a joint venturer.

3. *Opening statement.* The trial judge correctly denied the defendant's motion for a mistrial; direct evidence was offered to support that part of the prosecutor's opening statement in which she told the jury "that night on the street Richard Bailey died because he got the best of a fist fight the night before." A prosecutor is free to articulate in her opening statement a particular underlying motive which is expected to be proved in the case-in-chief as long as that expectancy is reasonable and grounded in good faith. *Commonwealth* v. *Geary*, 32 Mass. App. Ct. 511, 514 (1992). Testimony was offered by the Commonwealth's witnesses that, the night before the stabbing, the victim fought with Jermaine Coakley, a friend of the defendant. The next day the defendant asked the victim, "Did you fight with my little 'brother'?" The victim replied in the affirmative. The defendant then said, "I don't like the way you said that; I'll be back

around later." The defendant also said to the victim and a group of his friends, "You'll get yours. You'll get yours." This evidence provided an adequate basis for the reference in the prosecutor's opening statement.

Accordingly, the judgment founded on the jury's verdict for murder in the second degree is affirmed, and the order denying the motion for a new trial is affirmed.

*So ordered.*