## Commonwealth *vs.* John Tague.

Norfolk. April 6, 2001. - July 10, 2001.

Present: Marshall, C.J., Spina, Cowin, Sosman, & Cordy, JJ.

*Homicide. Practice, Criminal,* Capital case, Admissions and confessions, Instructions to jury, Discovery, New trial. *Joint Enterprise. Evidence,* Declaration against interest, Admissions and confessions.

In a murder case, evidence presented to a grand jury was sufficient to enable the Commonwealth to proceed against the defendant as a principal or joint venturer, or both, and the fact that the Commonwealth elected not to seek indictments against the other assailants for murder did not defeat a prosecution of the defendant under a joint venture theory. [513-515]

At a murder trial based on a theory of joint venture, it was error for the judge to exclude evidence admissible as a declaration against interest in the form of an adoptive admission; however, the error was harmless beyond a reasonable doubt, where the Commonwealth's case against the defendant as a joint venturer would have remained overwhelming had the statement been admitted. [515-517]

Where, at a murder trial, there was no basis in the evidence for an instruction on involuntary manslaughter, the judge properly declined to so instruct. [517-519]

At a murder trial, the judge properly denied the defendant's motions for post-conviction discovery, where the defendant failed to establish a "prima facie case for relief," as required by Mass. R. Crim. P. 30 (c) (4). [519]

A trial court judge properly denied, without a hearing, a criminal defendant's motion for a new trial, where the motion failed to raise a substantial issue supported by a substantial evidentiary showing. [519-520]

No reason appeared on the record of a trial for murder in the first degree for this court to exercise its power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. [520]

Indictments found and returned in the Superior Court Department on December 4, 1996.

The cases were tried before *Elizabeth Butler,* J., and motions for postconviction discovery and for a new trial were considered by her.

*Dana Alan Curhan* for the defendant.

*Brian A. Wilson,* Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant, John Tague, was convicted of murder in the first degree of Jason Linsky on theories of deliberate premeditation and extreme atrocity or cruelty, armed assault of Brian McLaughlin with intent to murder, six indictments charging assault and battery (of three others) by means of a dangerous weapon, and two indictments charging assault and battery (of six people, including the five described in the other indictments).[1] On appeal he claims the trial judge committed error in (1) the denial of his motion to dismiss, in which he argued that he could not be tried for murder on a theory of joint venture where none of the other assailants had been indicted for murder; (2) the exclusion of evidence, admissible as a declaration against penal interest, that Larry Sullivan, a codefendant, had stabbed and killed Linsky; (3) the refusal to instruct the jury on involuntary manslaughter; (4) the denial of his motion for post-trial discovery; and (5) the denial of his motion for a new trial without a hearing. The defendant also asks us to exercise our power under G. L. c. 278, § 33E, to dismiss the indictment or reduce the verdict. We affirm the judgments and decline to exercise our power under § 33E.

1. We summarize the facts the jury could have found, reserving other details for discussion of the issues. During the evening of October 26, 1996, while the defendant and several friends were at the apartment of Larry Sullivan in Franklin, seven more friends arrived. They explained that they had just been thrown out of a Halloween party[2] at the McLaughlin home in Norfolk, and that someone dressed in a red devil costume had spit in the face of Amy Tougas.[3] The defendant and his friends decided to return to the party to "kick ass." The defendant put on his green flight jacket and looked for some knives. The group armed

---

[1]At sentencing, the judge dismissed two assault and battery convictions as duplicative, and a third was nol prossed by the Commonwealth. The defendant also had been found not guilty on an indictment charging intimidation of a witness.

[2]None of the seven had been invited to the party. When they arrived and were told that costumes were needed, the group drew swastikas and X's on their foreheads, and thereby impersonated the Charles Manson "family." It was this choice of fashion that caused them to fall out of favor quickly with the invited guests. As the seven left, one of them yelled at the person in the red devil costume, "I'm coming back for you!"

[3]Tougas testified under a grant of immunity.

themselves with pipes, sticks, wrenches, and anything else that could be used as a weapon. They discussed targeting "the red devil."

The group went out seeking reinforcements, finding one. Eventually numbering thirteen, they drove to the party in two cars. They formed a semicircle around the guests sitting outdoors by the fire. A melee broke out. Four guests were stabbed and others were kicked, punched, and beaten. Linsky, the guest who was dressed as a red devil, died. He suffered nine stab wounds, five to the front of his chest, one to the right side of his chest, one to his lower back, one to his left thigh, and one to his right thigh. Two of the chest wounds were potentially fatal: one penetrated six inches, severing the right internal mammary artery and puncturing the right lung; the other, four and one-half inches deep, punctured the right lung, diaphragm, and liver. While Linsky was lying on the ground, a white male with a shaved head, about six feet tall, wearing stonewashed blue jeans and a green flight jacket, crouched over him and delivered several violent downward blows for approximately twenty seconds. It was the Commonwealth's theory that this was the defendant. At the same time another white male wearing a cranberry-colored flight jacket kicked Linsky twice, and a third person stood close by.

The attack ended abruptly when the defendant yelled, "Rally." As the group fled, some were pursued by Brian McLaughlin. The defendant jumped McLaughlin from behind and stabbed him several times, puncturing both lungs and nicking a kidney.[4]

The defendant left in Tougas's car with one-half of the original group. The other half never left, as the police arrived and stopped them. Back at Sullivan's apartment, the defendant washed his hands and said he had stabbed someone. As the group was discussing alibis, the defendant said, "Well, nobody saw me there the first time, nobody would recognize me." He boasted that he could "get away with it." At one point he went to a convenience store across from Sullivan's apartment and

---

[4]The attack on McLaughlin resulted in the defendant's conviction of armed assault with intent to murder McLaughlin. The defendant has not asserted any error with respect to that conviction.

said to the store clerk, "I just fucked up some dude real bad. He's on his way to the hospital, if he makes it that far." Shortly after he returned to Sullivan's apartment, he asked Tougas to give him a ride home. Along the way he said he "had stabbed the fool, the red devil," adding "I know I hit his heart."

The defendant gave several statements to the police. He denied stabbing anyone, but he admitted striking three people with a baseball bat. He admitted that three or four kitchen knives were passed around in the car in which he rode. He said he did not take any, but he touched at least one. Police recovered three knives at the scene, but could not identify any fingerprints on them.

2. *Motion to dismiss.* The defendant argues that it was error to deny his motion to dismiss the murder indictment because the Commonwealth was proceeding exclusively on a theory of joint venture, and where none of the other coventurers had been charged with murder there was no principal actor with whom he could have shared the requisite mental state. The defendant is mistaken in his assertion that the Commonwealth did not proceed against him as a principal. The prosecutor announced in his opening that the Commonwealth was proceeding against the defendant both as a joint venturer and as a principal, and the judge instructed the jury under both theories. Even if the defendant had been prosecuted solely on a theory of joint venture, it was not error to permit the Commonwealth to proceed under that theory.

The validity of a conviction under a theory of joint venture does not depend on all coventurers being charged with the same offense. A conviction under a theory of joint venture may be obtained where the identity of the principal is unknown, and therefore no principal has been charged. See *Commonwealth* v. *Drumgold*, 423 Mass. 230, 254 (1996); *Commonwealth* v. *Dyer*, 389 Mass. 677, 682-683 (1983). Nor is a conviction under a joint venture theory defective if the principal is convicted of a lesser offense, or even if the principal is acquitted. See *Commonwealth* v. *Todd*, 408 Mass. 724, 729-730 (1990) (coventurer's murder conviction affirmed after principal convicted of manslaughter at separate trial); *Commonwealth* v. *Jones*, 403 Mass. 279, 290 (1988) (murder in the first degree conviction af-

firmed after sole coventurer acquitted at separate trial). If a conviction on a theory of joint venture may be based on the acts of an unknown, uncharged principal, or the acts of a principal who has been acquitted, it follows that a conviction on a theory of joint venture may be based on the acts of a principal charged with a lesser offense.

The relevant inquiry here is whether the evidence presented to the grand jury was sufficient to support the indictment for murder under the theory that the defendant was involved in a joint venture, that is, that he (1) was present at the scene of the crime; (2) with knowledge that another intended to commit the crime (of murder); (3) that by agreement he was willing and available to help the principal, if necessary; and (4) that he shared with the principal the mental state required for the crime. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 689-690 (2001). Although the defendant admitted to Tougas that he actually stabbed Linsky, in which case the defendant would be the principal, there was also evidence that he told the police that he stabbed no one. The Commonwealth was entitled to pursue its case against him under the alternative theory that, if he did not stab Linsky, someone in his group did and he was "at least a participant, even if he was not the sole perpetrator, and that he possessed the state of mind required for guilt." *Commonwealth* v. *Dyer*, *supra* at 683.

A prosecutor's decision to treat coventurers differently in the charging process does not affect the evidentiary basis for proceeding against a defendant under a theory of joint venture.[5] See *Commonwealth* v. *Mattos*, 404 Mass. 672, 681 (1989) (conviction of murder under joint venture theory upheld where case against coventurer nol prossed after defendant's trial); *Commonwealth* v. *Champagne*, 399 Mass. 80, 92 (1987) (similar result, but coventurer permitted to plead to manslaughter). The

---

[5]The defendant also points to an incorrect statement by the prosecutor before trial to the effect that, even though the defendant went beyond the scope of the joint venture, he remained a joint venturer essentially for all purposes. The judge was not bound by the prosecutor's statements, and incorrect legal assertions by the prosecutor have no bearing on our assessment of whether the judge committed error. The judge's decision must be, and was, guided by the sufficiency of evidence of joint venture, not the prosecutor's theories. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 691-692 (2001).

decision to prosecute is discretionary and "particularly ill-suited to judicial review." *Commonwealth* v. *Latimore*, 423 Mass. 129, 136 (1996), quoting *Wayte* v. *United States*, 470 U.S. 598, 607 (1985). The defendant does not argue that the decision to proceed against him alone was based on an impermissible reason, such as a selective prosecution based on race. See *Commonwealth* v. *Latimore, supra.* The evidence presented to the grand jury was sufficient to enable the Commonwealth to proceed against the defendant as principal or joint venturer, or both. The fact that the Commonwealth elected not to seek indictments against anyone else for murder did not defeat a prosecution of the defendant for murder under a joint venture theory.

3. *Third-party culprit evidence.* Before calling Marlene Eich to testify, the prosecutor filed a motion in limine to prevent defense counsel from asking her about her conversation with Sullivan at the scene. Sullivan had been isolated and handcuffed for safety considerations because he was being particularly aggressive toward a female officer as members of the opposing groups were yelling at one another after the first two of many police officers arrived. Eich, who had worked with Sullivan at a local restaurant for four months, approached him and said, "Larry . . . you stabbed my boyfriend" (Linsky). The judge permitted defense counsel to impeach Eich with her statement that Sullivan stabbed Linsky because it was anticipated that she would testify that she never witnessed the stabbing. The judge refused to admit evidence of Sullivan's response because it was anticipated that there would be no evidence that Sullivan knew that Linsky was Eich's boy friend. Defense counsel made an offer of proof that, if permitted to testify as to Sullivan's response, Eich would say that he "turned around and smiled at her and nodded." The defendant argues that it was error to refuse to admit evidence of Sullivan's response because he "is entitled to present evidence tending to show that someone else committed the crime for which he stands accused." *Commonwealth* v. *Galloway*, 404 Mass. 204, 207 (1989). He further contends that Sullivan's response was admissible as a declaration against penal interest. *Id.* Because the issue is one of constitutional dimension, *Commonwealth* v. *Jewett*, 392 Mass. 558, 562 (1984), our review looks to whether any error was harmless

beyond a reasonable doubt. See *Commonwealth* v. *Adams*, 416 Mass. 55, 58 (1993).

Before a statement may be admitted as a declaration against penal interest, "[1] the declarant's testimony must be unavailable; [2] the statement must so far tend to subject the declarant to criminal liability 'that a reasonable man in his position would not have made the statement unless he believed it to be true'; and [3] the statement, if offered to exculpate the accused, must be corroborated by circumstances clearly indicating its trustworthiness." *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986), quoting *United States* v. *Thomas*, 571 F.2d 285, 288 (5th Cir. 1978). Because Sullivan's alleged declaration against interest took the form of an alleged adoptive admission, the defendant must also show "that the party has heard and understood the statement, that he had an opportunity to respond, and that the context was one in which he would have been expected to respond to an accusation." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 719 (1993), cert. denied, 513 U.S. 835 (1994).

Sullivan's statement met the foundational requirements of an adoptive admission. According to the defendant's offer of proof, Sullivan must have heard and understood Eich's accusation because he turned to her and responded. The accusation was one which, if untrue, he would be expected to deny. Any ambiguity in the response goes to its weight, not its admissibility. See *Brown* v. *Commonwealth*, 407 Mass. 84, 90 (1990), *S.C.*, 414 Mass. 123 (1993).

The statement was admissible as a declaration against penal interest. The Commonwealth conceded at trial that Sullivan was unavailable. Sullivan's response subjected him to criminal liability and any reasonable person in his position would have known as much, and for that reason would not have made the statement without believing it to be true. The statement must be corroborated by evidence of its trustworthiness. This element of the test requires the judge "to assess the credibility of the declarant [here, Sullivan] and to admit a statement if 'there is some reasonable likelihood that the statement could be true.' " *Commonwealth* v. *Galloway*, *supra* at 208, quoting *Commonwealth* v. *Drew*, *supra* at 76. We have urged judges to be

flexible in this situation and favor the admission of such statements, leaving assessments of credibility of the witnesses and the weight of the testimony to "the good sense of the jury." *Commonwealth* v. *Galloway, supra* at 208-209. *Commonwealth* v. *Drew, supra* at 75-76. See *United States* v. *Barrett*, 539 F.2d 244, 253 (1st Cir. 1976). Here, corroboration comes from evidence that Sullivan was wearing a cranberry-colored flight jacket similar to the one worn by the white male seen kicking Linsky. It was error to exclude the statement.

However, we are persuaded that the error was harmless beyond a reasonable doubt. Had Sullivan's adoptive admission been admitted, the Commonwealth's case against the defendant as joint venturer would have remained overwhelming. The Commonwealth's pathologist testified that Linsky's wounds were consistent with being inflicted by one or more of the knives recovered by police at the scene. Sullivan's admission, if believed,[6] was not a statement that he alone stabbed Linsky. That is, it did not tend to prove that Sullivan, and not the defendant, stabbed Linsky. Given the defendant's admission to Tougas that he stabbed Linsky, the jury easily could have concluded that both men stabbed Linsky, as joint venturers. Alternatively, if the defendant did not do the stabbing, his participation in Linsky's beating, his awareness of the nature and severity of Linsky's injuries when no one else but the principal knew, and his willingness to take credit for the killing, join to form a tight seal on the case against him as joint venturer.

4. *Involuntary manslaughter.* The defendant claims that the judge erred by denying his request for an instruction on involuntary manslaughter. He bases this on the evidence that he and the other members of his group went to the party only intending to fight, and that no one else was indicted for murder.

"An instruction on involuntary manslaughter is required where any view of the evidence will permit a finding of manslaughter and not murder." *Commonwealth* v. *Pierce*, 419

---

[6]The prosecutor represented at sidebar that, shortly after the exchange with Eich, Sullivan denied stabbing anyone. Sullivan's denial would be admissible as a prior inconsistent statement to impeach Sullivan's credibility, as if he had testified. See Proposed Mass. R. Evid. 806; *Commonwealth* v. *Pina*, 430 Mass. 66, 75 (1999).

Mass. 28, 33 (1994). Involuntary manslaughter is an unintentional killing resulting from "wanton and reckless conduct . . . [or] . . . a battery not amounting to a felony which the defendant knew or should have known endangered human life." *Id.* "When it is obvious, however, that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required." *Id.* See *Commonwealth* v. *Diaz*, 431 Mass. 822, 831 (2000). When determining whether such an instruction was required, we consider the evidence in a light most favorable to the defendant. See *Commonwealth* v. *Degro*, 432 Mass. 319, 330 (2000).

The most favorable evidence has the defendant in the company of a dozen people armed with pipes, sticks, wrenches, belts, and three or four knives, driving through two towns to fight a group of unsuspecting partygoers, whom they then ambushed. The defendant admitted hitting three people with a baseball bat. He knew several of his associates were armed with deadly weapons. Linsky was kicked and he was stabbed nine times while he lay on the ground. Two of his wounds were caused when one or more knives were thrust deep into his chest, killing him. The ferocity of the attack on Linsky is inconsistent with unintentional, reckless behavior. See *Commonwealth* v. *Snow*, 34 Mass. App. Ct. 27, 33 (1993); *Commonwealth* v. *Sowell*, 22 Mass. App. Ct. 959, 963 (1986). The risk of harm associated with plunging a knife deep into the torso of a person lying defenseless on the ground "is the kind of risk that could only lead to a determination of malice." *Commonwealth* v. *Nichypor*, 419 Mass. 209, 217 (1994). The evidence establishes that, even as a joint venturer, the defendant knew there was a "substantial likelihood" that Linsky would be killed. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 350 (1991).

The defendant's own testimony about his use of the baseball bat on four people and the part others played during the raid, including their use of dangerous weapons and their possession of knives, suggests that he did not believe "that only a simple assault and battery was to be committed by the participants and [that] he had no knowledge that it would escalate into the use of a dangerous weapon on the victim," as might warrant an

involuntary manslaughter instruction. See *Commonwealth* v. *Snow*, *supra* at 32. The requested instruction was properly denied.

5. *Postconviction discovery.* The defendant filed motions for postconviction discovery of the clothing worn by Sullivan for the presence of blood matching that of Linsky. The motions were denied.

Before postconviction discovery may be ordered, a defendant must establish "a prima facie case for relief." Mass. R. Crim. P. 30 (c) (4), 378 Mass. 900 (1979). See *Commonwealth* v. *Bennett*, 39 Mass. App. Ct. 531, 535 n.6 (1995). The presence of Linsky's blood on Sullivan's clothing would not exculpate the defendant. It would not demonstrate that Sullivan alone stabbed Linsky or that he stabbed him at all. There was evidence from which the jury could have concluded that, if blood were transferred to Sullivan's clothes, it happened as he kicked Linsky. The defendant failed to meet his burden. There was no error.

6. *Motion for a new trial.* The defendant filed a motion for a new trial on the basis of newly discovered evidence. See Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). See *Commonwealth* v. *Moore*, 408 Mass. 117, 126 (1990). That "evidence" consisted of a news article that appeared in the Boston Sunday Globe newspaper, after the defendant's conviction, in which a reporter wrote that from his prison cell Sullivan had told her that he, not the defendant, killed Linsky. Sullivan is serving a sentence of from nine to twelve years for involuntary manslaughter for his part in Linsky's killing. The article also reported that, according to Sullivan, other members of the gang who participated in the attack formed a plan to let the defendant take the blame. The motion judge, who was also the trial judge, denied the motion on ground that it failed to "cast[] real doubt on the justice of the conviction." *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986).

The newly discovered evidence must be admissible. *Id.* at 306. *Commonwealth* v. *Stewart*, 383 Mass. 253, 258 (1981). Sullivan's statement, which is not in the form of an affidavit,

but only newsprint,[7] includes an assertion that he came forward at this time because "[t]hey can't take me and recharge me." Sullivan's statement, as reported in the newspaper, does not qualify as a declaration against penal interest because it was not given with the realization that it would subject him to criminal liability. See *Commonwealth* v. *Drew, supra* at 74. It is immaterial that Sullivan could still be prosecuted for conspiracy to commit murder, see *Commonwealth* v. *Francis,* 375 Mass. 211, 215-216, cert. denied, 439 U.S. 872 (1978), because, at the time he made the statement, he believed he was immune.

The motion for a new trial did not present any newly discovered evidence, as such, and was properly denied. Because the motion did not raise a substantial issue supported by a substantial evidentiary showing, the judge was not required to hold a hearing. See *Commonwealth* v. *Lopez,* 426 Mass. 657, 663 (1998).

7. *General Laws c. 278, § 33E.* We have reviewed the entire record, the transcripts, the briefs, and the arguments and discern no reason to reduce the verdict or order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

[7]Sullivan submitted an affidavit, dated eight months after the Globe article, stating nothing more than that he had possession of information that would exonerate the defendant. He furnished no details, and expressed concern that, if he did furnish details in an affidavit, he might be charged with another crime.