COMMONWEALTH *vs.* JAMES J. KELLY.

No. 01-P-1087.

Worcester. February 6, 2002. - January 27, 2003.

Present: BECK, SMITH, & KANTROWITZ, JJ.

*Practice, Criminal,* New trial, Assistance of counsel, Argument by counsel, Instructions to jury, Argument by prosecutor, Transcript of hearing. *Constitutional Law,* Assistance of counsel. *Witness,* Cross-examination.

A criminal defendant failed to demonstrate that defense counsel rendered ineffective assistance in connection with the defendant's decision to testify at trial [208-210], or that defense counsel's strategy at closing argument was manifestly unreasonable [211-212].

At a criminal trial, the judge's inartful discussion of "moral evidence," as that phrase appears in the reasonable doubt charge of *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850), did not constitute reversible error, where the over-all charge was clear. [212]

A trial court judge did not err in limiting a criminal defendant's cross-examination of the victim, where the attempted line of questioning had no support in the evidence. [212-213]

Certain remarks made by a prosecutor during closing argument concerning a bruise on the victim's neck and the presence of blood on her undergarment, even if error, were not likely to have been a significant factor in the jury's deliberations and did not create a substantial risk of a miscarriage of justice. [213-214]

A criminal defendant failed to demonstrate that he was entitled to a new trial on the ground that missing portions of his trial record made review of certain of his claims on appeal impossible. [214-216]

INDICTMENTS found and returned in the Superior Court Department on April 13, 1987.

The cases were tried before *Herbert F. Travers, Jr.,* J., and a motion for a new trial, filed on April 26, 1988, was heard by him; a second motion for a new trial, filed on June 18, 2001, was heard by *Daniel F. Toomey,* J., and a motion for reconsideration was also heard by him.

*Nancy A. Dolberg (Elliot D. Lobel* with her) for the defendant.

*Brian J. Cann*, Assistant District Attorney, for the Commonwealth.

BECK, J. The defendant appeals from his 1987 convictions of two counts of rape and one count of indecent assault and battery, and from orders denying his motions for new trial and for reconsideration. The defendant's primary claim of error is that his trial counsel rendered ineffective assistance in connection with the decision to testify at trial. He also complains of other lapses on the part of his trial counsel, certain evidentiary errors, excesses in the prosecutor's closing argument, error in the judge's reasonable doubt instructions, and missing trial records. As to the last issue, addressed more fully at part 6, *infra*, we note that there are no transcripts of the pretrial motion hearings, the rebuttal testimony, or the sentencing hearing.

*The Commonwealth's case.* In October, 1985, the victim was twenty-seven years old. She was five feet two inches tall and weighed eighty-seven pounds. The mother of a four year old son, she had recently separated from her husband, who continued to stay with her when he had nowhere else to live.

The defendant, whom the victim called "Uncle Kelly," was the victim's cousin by marriage. He had been the best man at her parents' wedding. The defendant's and the victim's families both lived in Leominster and were close. The jury could have observed that the defendant weighed about one hundred forty-seven pounds and was between five feet eight and five feet nine inches tall. (The docket sheet reveals that he was fifty-six years old at the time of the assault.)

At about 7:00 P.M. on October 29, 1985, the defendant appeared at the victim's apartment carrying a six-pack of beer. Upon learning from the victim that her father was not there, the defendant stayed to talk with the victim and a friend of hers and drink some beer.

About two hours later, the victim's husband arrived. The defendant asked the victim's husband to babysit for the child so that the victim could go with the defendant to look at a truck he wanted to buy for one of his sons. The defendant explained that he wanted the victim to go with him because the woman selling the truck, who lived around the corner from the victim, had a jealous boyfriend. The defendant and the victim

then left the apartment in the defendant's new Lincoln Continental automobile. They located the truck but no one was home. The defendant said the woman was at her boyfriend's.

The defendant next drove down Lancaster Street to Saint Leo's Cemetery. By then, it was after 10:00 P.M. He told the victim he wanted to visit his father's grave. Upon arriving at the grave site, the defendant turned off the engine and locked the doors. He leaned over and began to remove the victim's sweater, while telling her that he loved her. He took off his trousers, pulled down her jeans, and got on top of her, touching her breasts. He briefly inserted his penis in her vagina. Then he grabbed the victim by the neck, forced her head toward his penis, put his penis in her mouth, and told her to bite him, whereupon he ejaculated. The victim begged him to stop, and tried to open the locked car door.

As the defendant and the victim were putting their clothes back on, another car entered the cemetery. The defendant recognized the driver as his son Michael. The defendant forced the victim into the back seat and held her down on the floor with his arm on her chest. The defendant drove out of the cemetery "like a maniac," telling the victim he would like to "do this again" and asking her not to tell anyone. Michael was following them. When the car slowed down and the victim heard the doors "unclicking," she reached for the door handle in the back seat and jumped out of the car. She discovered she was in front of her apartment. She heard Michael yelling; he was right behind them. She ran toward the apartment, and then upstairs, where she went into the bathroom, "got sick and cried."

Her husband noticed that when the defendant drove up, the victim was in the back seat and appeared to be fumbling with the lock to get out of the car. Michael pulled up across the street and was yelling something at the defendant. Both men "took off" shortly thereafter.

The victim had a glass of orange juice and, after a while, she responded to her husband's inquiry and "told him what had happened." The husband described the victim as "crying," "sobbing," "shaking," and "cursing" the defendant. He noticed a "red mark on her throat" that had not been there earlier. The

husband called the police, who took the victim to the hospital. Officer Louis Benoit arrived and took a statement from the victim. He noticed a red mark on the victim's jaw line going down her throat and requested that a nurse take a photograph of the injury. (The photograph was put in evidence.)

The police went to the defendant's house that night sometime after 3:00 A.M. Michael answered the door. In response to their inquiry, he led the officers to a rear entrance where the defendant was sitting on a couch, dressed. The police gave the defendant the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). When asked whether he had been with the victim earlier that evening, the defendant "began to shake" and admitted that he had. He said they drove around for a while. When asked if he did anything with her, "he really started to shake," put his hand to his chest, and said no. He admitted that he had taken her to the cemetery but said they only talked. He denied any sexual activity. When asked whether he had seen anyone as he was leaving the cemetery, the defendant initially said no. Then he admitted seeing his son. The defendant was then arrested.

So the evidence stood at the conclusion of the Commonwealth's case. The defendant then took the stand. Before discussing his testimony, we interrupt our narrative to recount what occurred between the defendant's arrest and the trial.

*The defendant's statements at the police station.* After his arrest, the defendant was taken to the police station. While there, he telephoned trial counsel, who agreed to come to the station. Officer Benoit continued to question the defendant without waiting for counsel to arrive. Officer Benoit "informed [the defendant] that [the victim] said that she did oral sex to him, and [the defendant] bent his head down and nodded and said yes but that she wanted to have oral sex with him, that she asked him."

The defendant filed a pretrial motion to suppress the statements he made to the police. After a hearing the day before trial, the trial judge allowed the motion to suppress "as to statements at [the] Police Station" but denied it "as to statements at [the] home of [the defendant]."

*The defendant's testimony at trial.* After the Commonwealth rested, the defendant elected to take the stand. His testimony on

direct examination was consistent with much of the Commonwealth's case, except that he denied sexual contact of any kind.

In the course of cross-examination, trial counsel objected to the prosecution's line of questions. At side bar, trial counsel asserted that the prosecutor was "heading dangerously close to asking questions about conversations at the police department which [had been] excluded pursuant to [the] motion to suppress." The prosecutor argued that statements excluded for violations of *Miranda* v. *Arizona, supra,* may be admitted for impeachment purposes so long as the statements themselves are voluntary. The prosecutor pointed out that the defendant's testimony that there had been no sexual contact between him and the victim was at odds with his admission to Benoit that there had been "consensual oral intercourse."

Defense counsel asserted that the "statements were suppressed because they were involuntary." The judge disagreed, observing that "the suppression was clearly stated by [him] to be because the defendant had asserted his desire to have his lawyer present." The judge denied that he had "previously [made] any determination that [the statements were] in any way involuntary." (As indicated above, the transcript of the suppression hearing is missing.) Defense counsel persisted in arguing that the statements "can't be used for any purpose. Otherwise, the Miranda rule has no significance." The judge reminded defense counsel that "there is law dealing with the right to use statements previously suppressed for a violation of the Miranda rule being used for impeachment purposes." Defense counsel replied, "I don't think that that would apply here." The judge responded, "Well, I believe that it would."

Before allowing the prosecution to proceed with cross-examination, the judge instructed the jury that in order to consider "evidence of statements by the defendant," they first had to determine that the statements were voluntary. The prosecutor duly continued his cross-examination of the defendant. The defendant acknowledged that he "recall[ed] officer Benoit asking [him] if [he] had oral sex with [the victim]," and asserted, "I did say no." Upon being asked whether he said anything else after denying sexual activity, the defendant said

"I didn't think so, I did say no." When the judge rephrased the prosecutor's question as to whether the defendant had "said anything else on the same subject" after denying sexual activity, the defendant responded, "No, I did not, I remember putting my head down and holding my chest because I was having severe heart pains, but I do not remember answering any further questions on that subject."

On redirect, the defendant estimated that he was taken to the police station sometime between 3:00 and 4:00 A.M. that night, that he had started work at 6:30 or 7:00 A.M. the previous morning, that he had not slept in the interim, and that he was having chest pains at the time he was questioned at the police station. He said he took several different medications three times a day for his heart problems. He also testified that he had a nose bleed at the police station. Following this testimony, the defense rested.

The Commonwealth then recalled Officer Benoit in rebuttal. Although there is no transcript of his testimony, there appears to be no dispute that he repeated the statements that had been suppressed.

*Motion for new trial.* Upon the jury's return of guilty verdicts on the three indictments on October 8, 1987, the defendant collapsed in the courtroom and was taken to the hospital. Six months later, after numerous continuances, the defendant was sentenced to two concurrent sentences of ten years, and one concurrent sentence of five years, at the Concord reformatory. See *Commonwealth* v. *Thurston*, 53 Mass. App. Ct. 548, 554-555 (2002). On April 26, 1988, five days after sentencing, the defendant, through current appellate counsel, filed a motion for new trial pursuant to Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979), and a motion for stay pursuant to Mass.R.Crim.P. 31(a), 378 Mass. 902 (1979). He claimed he was entitled to a new trial because he was "denied effective assistance of counsel in that trial counsel's decision to put him on the stand opened the door to prosecution evidence that was prejudicial and otherwise excludable." For reasons not apparent from the record, no hearing was held on the motion until May 1, 1992, four years after it was filed. The trial judge had allowed the motion for stay on July 6, 1988.

In an affidavit filed with the motion in April, 1988, the defendant averred that at some point prior to trial he had a conversation with trial counsel about his "alleged statements." He could not remember when the conversation occurred or the words used other than that counsel said if the "statements" were admitted against the defendant at trial "they would 'hang [him].' " According to the defendant, "[he] was never informed by [trial counsel] (or anyone else) that if [he] took the stand at [his] trial, that any part of the suppressed statements could be used against [him] in any fashion. When [he] was cross examined regarding these statements [he] was totally taken by surprise." In a second affidavit, filed in court on the day of the hearing in May, 1992, but apparently signed a year before, the defendant repeated the substance of his earlier affidavit and added that "[h]ad [he] known that the suppressed statements could be used in any way if [he] testified at trial, [he] would not have testified." The trial judge did not credit these averments as evidence of "discussion between a lawyer and his client concerning whether the defendant should testify or not."

A four-sentence affidavit of trial counsel did not address the defendant's claims, but merely asserted that the defendant had consistently denied "any sexual contact of any kind with the alleged victim" every time they discussed the "matter." Trial counsel was the sole witness at the hearing on the motion for new trial. His testimony was brief, with little information regarding the interaction between counsel and the defendant. Responding to appellate counsel's leading questions, trial counsel testified that the defendant's affidavit was "accurate," and essentially for the first time adopted the averments in the defendant's second affidavit.

*Findings on the motion for new trial.* In an eleven-page memorandum and order issued on the day of the hearing, the judge denied the defendant's motion for a new trial. The judge specifically found that it was not counsel but the defendant who made the decision to testify, "[i]n order to enhance his position before the jury." The judge commented that the circumstances of a decision to testify may vary, and gave an example: "where a husband is accused of rape, he may feel compelled to satisfy his wife and family that the accusation is false (as he has previously assured them)."

The judge did not credit trial counsel's testimony at the hearing on the motion for new trial that he thought he told the defendant the suppressed statement could not be used for any purpose. The judge explicitly found that "there was no such discussion with the defendant." He based this finding on the fact that the defendant "[did] not refer to such a statement by his lawyer in either his affidavit filed with the motion in 1988 or the further one filed today [the day of the hearing]. [Nor did counsel] mention it in his [own] 1988 affidavit." Although the judge concluded that "[a]pparently, there was some discussion between the defendant and his lawyer about his testifying, [the judge was] unable to determine what the discussion was, when it occurred, and how long it took." The judge ruled that "[u]nder the circumstances of this case, the defendant has not shown that there was any manifestly unreasonable conduct or ineffective assistance of his counsel in connection with [the defendant's] decision to testify," keeping in mind "that the burden of proof on this issue rests upon the defendant."

*Issues on appeal.*

1. *Ineffective assistance of counsel: Analysis of motion for new trial.* "A motion for new trial is addressed to the sound discretion of the judge, and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, or unless the trial was infected with prejudicial constitutional error." *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990) (citations omitted). Reversal for abuse of discretion is particularly rare where, as here, the trial judge is also the judge acting on the motion. *Ibid.* The defendant argues that his trial counsel had an "obligation to advise [him] on the potential use of the suppressed statements against him before [he] made the decision to waive his right against self-incrimination and to testify at trial." This failure, he insists, was prejudicial error. Noting that it was the defendant's burden to establish such an error, the trial judge found that "there [was] no demonstration made that there was any obligation on the lawyer's part to give this advice" in this case. Cf. *United States* v. *Decoster*, 624 F.2d 196, 211 (D.C. Cir. 1976) (claims of failure to investigate were "abstractions without context").

A lawyer's advice, or lack thereof, can be evaluated only in

the context of the relationship between the defendant and his counsel as well as the circumstances of the case. See *Strickland* v. *Washington*, 466 U.S. 668, 688-691 (1984). "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's . . . decisions." *Id.* at 691. Here there was minimal evidence as to what advice counsel actually gave the defendant or how the defendant responded to that advice. The affidavits of the defendant and of trial counsel were brief and conclusory. See *Commonwealth* v. *Thurston*, 53 Mass. App. Ct. at 551 (credibility, weight, and impact of affidavits entirely within judge's discretion). Trial counsel's testimony, an important element of which the judge did not believe, consisted primarily of brief responses to leading questions designed to establish that he believed the defendant's statement (acknowledging consensual oral sex) "was suppressed for all purposes," that he thought he communicated this belief to the defendant, and that he would have given different advice had he known otherwise. Compare *Commonwealth* v. *White*, 409 Mass. 266, 268-271 (1991), cited by the trial judge in his memorandum of decision, where there was a "full evidentiary hearing," including trial counsel's detailed testimony about his discussions with the defendant concerning trial strategy, whether the defendant should testify, and whether the defense should be consent or denial. Two trial witnesses also testified about their conversations with the defendant and the victim. See *Commonwealth* v. *Degro*, 432 Mass. 319, 334 (2000) (counsel and defendant both testified, providing information about their discussion of defense theories, means of presenting theories, and advisability of defendant testifying); *State* v. *Thomas*, 128 Wash. 2d 553, 561 (1996) ("The defendant must . . . produce more than a bare assertion that the right [to testify or not] was violated; [he] must present substantial, factual evidence in order to merit [relief]").

The cases the defendant cites in support of his argument are of no avail. In those cases, the defense introduced considerably more evidence regarding the process of deciding whether or not the defendant should testify than was the case here. See *Commonwealth* v. *Freeman*, 29 Mass. App. Ct. 635, 638 (1990) (defense counsel's affidavit confirmed defendant's claim); *Com-*

*monwealth* v. *Conley*, 43 Mass. App. Ct. 385, 388-396 (1997) (detailed affidavit of trial counsel; trial counsel and defendant both testified at hearing). See also *United States* v. *Teague*, 953 F.2d 1525, 1527-1529 (11th Cir. 1992) (both defendant and trial counsel testified at evidentiary hearing, the latter at length, as to facts underlying trial counsel's advice); *United States* v. *Frappier*, 615 F. Supp. 51, 51-52 (D. Mass. 1985) (evidence recounting interactions between defendant and defense counsel introduced at hearing on motion to suppress); *Wogan* v. *United States*, 846 F. Supp. 135, 141-142 (D. Me. 1994) ("inquiry must focus on 'the competence and soundness of defense counsel's tactical advice' "; court had before it evidence of conversations between defendant and defense counsel). Compare *Commonwealth* v. *Wheeler*, 52 Mass. App. Ct. 631, 635-636 (2001) ("Judges are to apply the standard set forth in [Mass.R. Crim.P. 30(b)] rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth").

We note in passing that the defendant's appellate argument in this court is not the argument he presented in the trial court. In this court he argues that he "did not make a voluntary waiver of his right not to testify" and was thereby denied effective assistance of counsel, citing *Commonwealth* v. *Freeman, supra,* and *United States* v. *Teague, supra.* In the trial court he argued ineffective assistance of counsel under *Strickland* v. *Washington,* 466 U.S. 668 (1984), and *Commonwealth* v. *Saferian,* 366 Mass. 89 (1974). There appear to be differences between these theories, with respect to the burden of proof and perhaps the standard of review as well. Compare *Commonwealth* v. *Freeman, supra* at 642, with *Commonwealth* v. *Saferian, supra* at 96. See *Commonwealth* v. *Degro,* 432 Mass. at 334-337, treating as separate issues a claim of ineffective assistance of counsel allegedly stemming from trial counsel's failure to advise the defendant of the strategic implications of testifying or not testifying, and a second claim that the defendant's waiver of his right to testify at trial was not knowing, voluntary, and intelligent. Neither party addresses this distinction. In view of this omission and our conclusions above, we do not discuss this issue further. We address the remaining issues in the order in which the defendant presents them.

2. *Trial counsel's closing argument.* The defendant also contends on appeal that trial counsel's closing argument was "essentially incoherent" and "a disgrace" and constituted further ineffective assistance of counsel. He claims that the effect of what counsel argued "completely contradicted his client's testimony and stipulated to the jury an element of the offense charged — that defendant and complainant had sex." This argument is unavailing.

The first part of counsel's closing argument, in which there are a number of passages described as "inaudible," challenges the victim's account of the events in the cemetery. That counsel focused on different aspects of the victim's testimony than those the defendant argues in his appellate brief does not make trial counsel's choices "manifestly unreasonable." See *Commonwealth* v. *Roberts*, 423 Mass. 17, 20 (1996). After attacking the heart of the case, arguing "that penetration in that position, under those circumstances, was virtually impossible," counsel asserted that whatever the mark on the victim's neck in the photograph was, it was not caused in the car. His next statement is "Consent to the acts that are charged or lack of consent (inaudible). We assume that she submitted willingly to whatever she says that happened (inaudible)." Given the inaudibles, it is not clear what this means. See Mass.R.A.P. 8(b)(3)(v), as appearing in 388 Mass. 1106 (1983) (parties shall promptly use reasonable effort to stipulate to unintelligible portions of recorded testimony, differences to be settled by trial judge).

Counsel then moved on to address the defendant's testimony and Officer Benoit's rebuttal. Trial counsel reminded the jury that the defendant was having chest pains, was taking medication, and may not have "understood what was happening at the police station or . . . even heard the questions." In the final sentence, counsel apparently said, "In any event, he assumed that he said and the truth is that, yes, she committed oral sex on me and she consented that she wanted it, she asked him (inaudible)." Again, although not clear, the two offending sentences may have been an argument to the effect that even if the jury believed Officer Benoit's testimony that the defendant admitted to consensual oral sex, that is not a crime. While the attempt to make alternative arguments may not have been a

winning strategy, the attempt to address Officer Benoit's testimony was not "manifestly unreasonable," and in any event, we doubt the result would "likely" have been different without it. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 & n.10 (1977).

In his closing argument, the prosecutor argued that the defendant's testimony corroborated the victim's testimony. To the extent that trial counsel should have objected to this argument (because the defendant's testimony could be considered only for impeachment, see *Harris* v. *New York*, 401 U.S. 222, 224 [1971]), the trial judge properly instructed the jury that they could consider the defendant's statements for "whether they show inconsistencies, but you cannot consider them as independent proof of the facts contained."

3. *Reasonable doubt instructions.* The defendant further claims the judge's discussion of "moral evidence," as that phrase appears in the reasonable doubt charge of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), constituted reversible error. We disagree. The judge first defined moral evidence as "the kind of evidence which is lacking in the certainty that scientific evidence may be, but that it's subject to error and it's subject to certain uncertainty. It doesn't lead to absolute certainty." The judge then gave a verbatim recitation of the *Webster* charge. While the judge's attention to "moral evidence" may have been inartful, the over-all charge was clear. See *Commonwealth* v. *Watkins*, 433 Mass. 539, 546-547 (2001). These instructions are readily distinguishable from those at issue in *Commonwealth* v. *Pinckney*, 419 Mass. 341, 347 (1995), on which the defendant relies. In that case "numerous inconsistencies . . . permeated the charge," including an incorrect definition of reasonable doubt. *Ibid.* As trial counsel here apparently recognized when he did not register an objection to the instruction, there was no error.

4. *Cross-examination of victim.* The defendant claims that the trial judge "committed reversible error by limiting . . . cross-examination of the [victim]." Trial counsel asked the victim whether she was afraid of her husband. The victim said, "No." Trial counsel next attempted to question her about the reasons she was separated from her husband and had filed for

divorce. The prosecutor objected and the judge sustained the objection. The judge told trial counsel that the defendant had to establish that the relationship was relevant to the trial before the judge would allow the questions. There was no error. Even after two motions for new trial, there is nothing in the record suggesting that the victim was afraid of her husband. *Commonwealth* v. *Kowalski*, 33 Mass. App. Ct. 49 (1992), on which the defendant relies, is distinguishable. In that case, the victim testified that her boyfriend had beaten her. *Id.* at 51-52. See *Commonwealth* v. *Hall*, 50 Mass. App. Ct. 208, 213 (2000) ("defendant must 'make a plausible showing that the circumstances existed on which the alleged bias is based,' " quoting from *Commonwealth* v. *Bui*, 419 Mass. 392, 401, cert. denied, 516 U.S. 861 [1995]). Particularly where there had been a close relationship between the victim's and the defendant's families, and where the defendant apparently had information about the victim's psychiatric history, see *infra*, the absence of any evidence supporting the attempted line of questioning is telling.

5. *Prosecutor's closing argument.* In closing argument, the prosecutor referred to as a bruise what previously had been described in testimony as a red mark on the victim's throat. He also argued that "[j]ust because [the police laboratory report on the victim's undergarment] says that human blood was not detected doesn't mean that it wasn't there. It means the test didn't detect it." The defendant claims the "repeated use of [the] term 'bruise' would have inflamed the jury and misled it as to the evidence before it." The defendant also claims that the remark about the laboratory report "placed the onus on [him] to disprove that there was blood on the underwear." Even if we assume both of these prosecutorial remarks were in error, they did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). The jurors were well able to make their own evaluation of the mark shown in the photograph. In any case, it is the presence and location of the mark, not whether it could be described as a "bruise" or a "red mark," that is significant.

As to the laboratory report, given that the victim testified she had been having her period and had been using a Kotex pad on the evening in question, the presence of blood or the lack thereof

was not likely to have been a significant factor in the jury's deliberations. Nor was there any error in the introduction through Officer Benoit of the photograph of the mark on the victim's neck.

6. *Missing trial record.* The defendant next argues that he "should be granted a new trial because missing portions of the trial record make review of certain of his claims impossible." He particularly points to the lack of a transcript of the hearing on his "motion to introduce evidence of [the victim's] prior complaints of rape or sexual assault."

By way of background, we note that it was clear at trial that there were necessary irregularities in producing a record. Fiscal constraints limited the availability of stenographers. Instead, cassette tapes were used to record some of the proceedings. (The trial record before us includes two volumes transcribed by a stenographer and three volumes of cassette transcriptions.)

At the time of filing the 1988 motion for new trial, appellate counsel submitted an affidavit describing his efforts to obtain the transcript and listing the results of his efforts. However, there is nothing in the record suggesting that he (or anyone else) timely followed the instruction of *Commonwealth* v. *Harris*, 376 Mass. 74, 79 (1978) (where transcripts are unavailable "a hearing should be held . . . to attempt to reconstruct the proceedings sufficiently to present any claims of the defendant. . . . All those with . . . relevant evidence, . . . particularly the attorneys involved at the trial, are under an affirmative duty to use their best efforts to ensure that a sufficient reconstruction is made if at all possible"). See *Commonwealth* v. *Woody*, 429 Mass. 95, 98 (1999) (appellant has burden to settle material omissions from record as provided in Mass. R.A.P. 8[c], [e], as amended, 378 Mass. 932 [1979]).

In support of his motion to introduce the victim's prior claim of rape, the defendant submitted a police investigation report of the victim's accusation that her husband's grandfather had sexually assaulted her. (Ironically, the officer who took the report was Officer Benoit.) The defendant also submitted an offer of proof setting out that there had been such a complaint, that the purported aggressor was over 80 years old and physically disabled, that the police made a complete investigation, and that

"[o]n March 23, 1985, the alleged victim in this case signed a statement which is on file with the Leominster Police Department, asking for her Complaint to be dropped and indicating that it was false."

There is nothing in the record to suggest that the defendant sought production of the statement he claimed was on file at the Leominster police department, at least until July, 2001, when the defendant apparently filed a motion for discovery. An assistant district attorney responded to that request by letter. She reported that the victim "did indicate to the police that she did not want to pursue the matter further, but in no way does her statement consist of a recantation or admission of any false allegation. Indeed, the investigation of her complaint yielded an additional possible complaint against the suspect by another woman who likewise did not want to pursue the matter." The assistant district attorney offered to bring the reports and the statement to the next court date (a hearing on the defendant's second motion for new trial) for in camera review, which in fact she did. At that hearing, the motion judge ordered the Commonwealth to provide defense counsel with a copy of the document, to be disclosed to "absolutely no one." As the Commonwealth points out, there is nothing in the record to suggest that the defendant ever requested that the alleged recantation statement be disclosed or included in the record.

The narrow exception to the longstanding rule that a prior false accusation of sexual assault is not admissible on the issue of credibility, see *Commonwealth* v. *Bohannon*, 376 Mass. 90, 93-94 (1978), does not apply to these facts. In *Bohannon*, the complainant's testimony was inconsistent and confused, there was an offer of proof from independent third party records (in that case hospital records) concluding that the allegations of rape had in fact been made and were in fact untrue, and consent was the issue. *Id.* at 94-95. None of these factors is present here.

As to the lack of a transcript for the sentencing hearing, that basis for a claim of error is entirely speculative. Moreover, there was nothing to prevent reconstruction of that hearing when participants were still available.

The alleged reconstruction of Benoit's testimony is not newly

discovered evidence. See *Commonwealth* v. *Tague*, 434 Mass. 510, 520 (2001). It is clear from the trial judge's decision on the first motion for new trial six months after trial that he had before him an account of Benoit's testimony, likely the police report at least. The motion judge did not err in concluding that the mere fact of what by then were limited problems with the transcript would not warrant a new trial.

7. *Other issues.* The husband's fresh complaint testimony was well within the permissible scope of such corroborating evidence. See *Commonwealth* v. *Aspen*, 53 Mass. App. Ct. 259, 266 (2001). Counsel was not ineffective for failing to object.

Nor was there any basis to complain of defense counsel's treatment of the victim's psychiatric and social work records. See *Commonwealth* v. *Oliveira*, 431 Mass. 609, 614-616 (2000) (claim of ineffective assistance for failure to obtain disclosure of counseling records turns on evaluation of records by trial court judge and determination of relevance). Trial counsel summonsed the records in. The trial judge examined the records and concluded that "[t]here [was] no basis for . . . disclosure of the materials." There is no showing in the record that an examination of those records would have been warranted.

The motion judge did not err in denying the defendant's second motion for a new trial. The motion judge reasonably determined, citing *Commonwealth* v. *Cronk*, 396 Mass. 194, 197 (1985), that he lacked jurisdiction to review the repeated claim of ineffective assistance of counsel in view of the pending appeal in this court of the denial of his motion for a new trial on the same ground. The other substantive claims have all been addressed above.

Finally, even were the defendant's claim of cumulative error as set out in his reply brief properly before us, see *Commonwealth* v. *O'Connor*, 406 Mass. 112, 121 n.8 (1989), we conclude that such relief is not required.

*Judgments affirmed.*

*Orders denying motions for new trial and for reconsideration affirmed.*