## COMMONWEALTH *vs.* RONALD QUALLS.

Suffolk. December 5, 1996. - June 6, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Evidence,* Hearsay, State of mind.

At the trial of murder indictments, evidence of the victim's state of mind, as reflected by his statements to others expressing fear that the defendant was going to kill him, should not have been admitted; and other hearsay statements indicating the victim's intention to "get" the defendant should not have been admitted where there was no evidence that the defendant knew of the victim's state of mind. [169-170]

In a murder case in which the identity of the gunman was in dispute and an important consideration was any motive the defendant had to kill either victim, improperly admitted evidence of one victim's fear of the defendant, which the judge incorrectly instructed the jury could be used as evidence of motive and which the prosecutor argued in closing as demonstrating motive, was prejudicial: the defendant was entitled to a new trial. [170-173]

INDICTMENTS found and returned in the Superior Court Department on November 10, 1992.

The cases were tried before *Robert W. Banks*, J.

*Eric S. Brandt*, Committee for Public Counsel Services, for the defendant.

*Kenneth H. Anderson*, Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. A jury found the defendant, Ronald Qualls, guilty of two indictments charging murder in the first degree, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and unlawful possession of a firearm. The assault by means of a dangerous weapon charge was placed on file with the defendant's consent. The defendant was given consecutive sentences of life imprisonment without parole on the murder convictions. He also received sentences of from nine to ten years on the assault and battery

by means of a dangerous weapon conviction and from three to five years on the firearm conviction, both of which were ordered to be served concurrently with the first life sentence. The defendant appeals from the several convictions.

The evidence relevant to this appeal is as follows. At approximately 10:30 P.M. on October 2, 1992, Ronald Price, known as "Dallas," and his brother, Roosevelt Price, known as "Tony," left their mother's apartment located in the Orchard Park housing project in the Roxbury section of Boston and went to a nearby bar called the Biarritz Lounge. They were soon joined there by two friends, Leroyal Holmes and Fred Monroe. The defendant was also present in the bar, accompanied by Junior Williams.

Dallas approached the defendant around 1:30 A.M. on October 3 and said, "I heard you [have] been looking for me on Shawmut." The defendant responded, "I don't even know you, man," to which Dallas stated, "I'm the one that stabbed your cousin." Dallas and the defendant then separated, but a few minutes later a fight erupted between them. Dallas's brother, Tony, became involved, putting the defendant in a headlock. Others in the bar broke up the fight and the defendant was escorted to the sidewalk just outside the bar. Tony then left the bar and the defendant approached him. After exchanging words, the defendant and Tony began to fight. The defendant stabbed Tony underneath his right armpit with a knife. Leroyal Holmes grabbed the knife from the defendant and separated the two combatants.

Meanwhile, inside the bar, Junior Williams had initiated a heated confrontation with Dallas. The two men grasped each other's jackets. Dallas said to Williams, "I don't understand why you're with [the defendant] against me," and "You're supposed to be my cousin, how [can] you turn on me for another person . . . ?" Williams responded, "I'm not your cousin no more . . . [the defendant is] my [friend] from Columbia Point . . . [he's] down with me." Williams also told Dallas that he was not going to lose his friendship with the defendant because the defendant "puts his life on the line [for Williams] every day." Dallas and Williams were ultimately separated. Williams then left the bar, and the defendant and Williams drove away in Williams's black Ford Escort automobile, with Williams driving and the defendant in the passenger seat.

After stopping briefly at their mother's house, Dallas and Tony, accompanied by their friends, Holmes and Monroe, headed to another bar in the area. On their way, they saw Monroe's girl friend, Mattie Buford, in a Geo Tracker automobile driven by Donna Carrington, a friend of Buford. After speaking with them, Carrington parked the automobile facing Washington Street in a parking lot bounded on three sides by Harrison Avenue, Washington Street, and Palmer Street. After being informed that it was too late to enter the second bar, the four men walked back to the Geo Tracker.

A dark Ford Escort then came into view on Washington Street and turned abruptly down Palmer Street, disappearing behind a building. Dallas observed, "There goes Junior [Williams's] car." Holmes, being concerned, walked across the parking lot toward Palmer Street to investigate.

When Holmes arrived at the corner of the parking lot nearest Palmer Street, a man identified at the trial by Holmes, Monroe, and Buford as the defendant, came around the corner and into the parking lot. After exchanging words with Holmes, the man drew a revolver and pointed it at Holmes, demanding that Holmes get out of his way. Holmes stepped aside, and the gunman proceeded across the parking lot toward the Geo Tracker. Holmes then yelled to his friends that the person approaching the Geo Tracker had a gun. Monroe and Buford ran from the Geo Tracker, while Dallas and Tony, who had climbed into the back seat, remained there. Carrington slouched down beneath the steering wheel and did not get a good look at the gunman. The gunman approached the back window of the Geo Tracker and fired one or more bullets at Dallas and Tony in the back seat. He then moved to the passenger side window, which was lowered, and fired one or more additional bullets at Dallas and Tony. The gunman then ran down Washington Street, past Monroe and Buford. Dallas had been struck by one bullet and Tony had been struck by two bullets.

Carrington then drove the Geo Tracker a very short distance to the building in which Tony's girl friend lived, and Tony, who had been seriously wounded, got out of the Geo Tracker. Holmes and Monroe drove Dallas to the hospital where he was pronounced dead.

The police were called to the building in which Tony's girl friend lived and, when they arrived, they encountered Tony,

who was in obvious pain and told the officers that he had been shot. In response to questions from two different officers, Tony twice stated that "Junior [Williams] did it," and provided additional details regarding the shooting and Junior's identity. During this time, Tony told his girl friend "to take care of [their] baby because [I'm not] coming back." Moments later, Tony was taken by ambulance to the hospital where he later died from the gunshot wounds.

On the first day of trial, the Commonwealth filed a motion in limine for leave to introduce evidence of out-of-court statements made by Dallas Price "indicating that the defendant was seeking to kill him." The prosecutor argued that the testimony was admissible to show Dallas's state of mind. Over the defendant's written opposition, the judge allowed the Commonwealth's motion.

Edie Price, the mother of Dallas and Tony, then testified that, when Dallas returned home from the Biarritz Lounge briefly on the night of the shooting, he said to her, "[E]verywhere I go and I look back, [the defendant] is right behind me, looking right over my shoulder . . . [the defendant is] the one that was threatening me all the time. . . . I think he's going to try to kill me tonight." After Edie Price testified, defense counsel renewed his objection, and the judge instructed the jury as follows:

> "Ordinarily, we do not permit a witness to testify to a conversation with someone else. However, we do have some exceptions to that hearsay rule and, in this case, I'm permitting this witness to testify as to what her son said to her that evening for a very limited purpose: one, as evidence of possible motive in the case — it is for you to decide eventually whether or not it is evidence of motive of anything or if it isn't — and, also, as evidence of the state of mind of her son at the time she alludes to, evidence of her son's state of mind, not for the truth of the words asserted actually."

Marie Fletcher, Dallas's girl friend, testified that on the night before the shooting, Dallas said to her, "[R]emember, I told you about this dude, Ron Qualls, that wanted to kill me. . . . [The defendant is] after [me] for something that happened a long time ago. . . . [H]e's gonna kill me." Before Marie Fletcher testified, the judge referred the jury to the

limiting instruction he had given following Edie Price's testimony, that is that the testimony was admitted "as evidence of possible motive [and] as evidence of [Dallas's] state of mind, not for the truth of the words asserted."

The judge repeated that instruction after September Sturrup, Dallas's close friend, testified. She testified that approximately one week before the shooting, Dallas said to her that the defendant "was back and [Dallas] felt like [the defendant] was going to get him this time." Sturrup testified that Dallas also said, "Either [the defendant's] going to get me or I'll have to get him." In addition, she testified that a few years before the shooting, as she and Dallas were walking in Orchard Park, Dallas saw the defendant and commented, "[H]ere comes that dude again . . . [d]on't turn around . . . I'm going to cut through the building and I'll meet you up on Dudley."

Leroyal Holmes testified that, in the Biarritz Lounge on the night of the shooting, Dallas stated that his "worst enemy was in the bar." The judge, once again, referred the jury to the limiting instruction.

On every occasion that the Commonwealth elicited the above testimony, defense counsel objected and those objections were overruled. At the close of the Commonwealth's case, defense counsel moved to strike the testimony "relative to Dallas Price's state of mind, and whether or not that reflects on [the defendant's] motive or feeling towards Dallas Price." The judge denied the defendant's motion.

"The broad rule on hearsay evidence interdicts the admission of a statement made out of court which is offered to prove the truth of what it asserted." *Commonwealth* v. *DelValle*, 351 Mass. 489, 491 (1966), *S.C.*, 353 Mass. 684 (1968). However, "the state of mind or intent of a person, whenever material, may be shown by his declarations out of court." *Goldman, petitioner*, 331 Mass. 647, 651 (1954), cert. denied sub nom. *Goldman* v. *Fogarty*, 348 U.S. 942 (1955). *Commonwealth* v. *Trefethen*, 157 Mass. 180, 181-188 (1892). The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it. See *Commonwealth* v. *Cruz*, 424 Mass.

207, 212 (1997); *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994); *Commonwealth* v. *Zagronski*, 408 Mass. 278, 283 (1990); *Commonwealth* v. *Olszewski*, 401 Mass. 749, 759 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994); *Commonwealth* v. *Todd*, 394 Mass. 791, 797 (1985). A murder victim's attitude of contempt or hostility toward the defendant, when it is known to the defendant, would constitute some evidence which, augmented by other evidence, might warrant a fact finder's determination that the defendant responded by killing the victim. However, a victim's contempt for the defendant or hostile attitude toward him, unknown to the defendant, would be irrelevant and inadmissible at the defendant's trial for murder. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977) ("Obviously, the victim's state of mind can be relevant to the defendant's motive only if there is reason to believe that the defendant knew of that state of mind").

In its argument that the judge did not commit reversible error by admitting evidence of Dallas Price's state of mind, the Commonwealth's principal focus is on the testimony of September Sturrup. The Commonwealth also argues, although briefly, that Leroyal Holmes's testimony was admissible. The Commonwealth does not argue, however, that the state of mind testimony given by Edie Price and Marie Fletcher was properly admitted. Instead, the Commonwealth makes the following two statements in its brief: (1) "Although perhaps it would have been better if the statements made by Marie Fletcher and Edie Price had not been offered, the balance of the testimony was properly admitted as probative evidence of the victim's state of mind toward the defendant, and therefore there was no reversible error"; (2) "Although it was probably error to admit the statements of Edie Price and Marie Fletcher . . . such evidence was merely cumulative of other, properly admitted evidence, and therefore no reversible error occurred."

As we have said earlier in this opinion, September Sturrup testified that approximately one week before Dallas was shot Dallas told Sturrup that the defendant "was back and [Dallas] felt like [the defendant] was going to get him this time." Sturrup also testified that Dallas also said, "Either [the defendant's] going to get me or I'll have to get him." In addition, Sturrup testified that a few years before Dallas was shot,

as Sturrup and Dallas were walking in Orchard Park, Dallas saw the defendant and commented, "[H]ere comes that dude again . . . [d]on't turn around . . . I'm going to cut through the building and I'll meet you up on Dudley."

For the most part, these statements went no further than to indicate Dallas's fear of the defendant. A murder victim's statement that he feared the defendant, even if made known to the defendant, sheds no light on whether the defendant had a motive to kill him, and therefore is not admissible in the defendant's trial for murder. See *Commonwealth* v. *Cyr, ante* 89, 92-95 (1997); *Commonwealth* v. *Williams*, 30 Mass. App. Ct. 543, 548 (1991), citing *Commonwealth* v. *DelValle, supra* at 492-493; *Commonwealth* v. *Bond*, 17 Mass. App. Ct. 396, 399 (1984); *United States* v. *Brown*, 490 F.2d 758, 765 (D.C. Cir. 1974); McCormick, Evidence § 296, at 853-854 (3d ed. 1984).

Dallas's statement, as testified to by Sturrup, that either the defendant would get him or he would get the defendant, perhaps could be construed not so much as indicating fear but as indicating Dallas's intention to "get" the defendant. In any event, unless that state of mind was communicated somehow to the defendant, it sheds no light on the defendant's state of mind, and it is the defendant's state of mind that is at issue. The principal danger in admitting evidence of a homicide victim's fear of the defendant or desire to "get" the defendant when there is no evidence of the defendant's awareness of the victim's state of mind is that the jury will consider the victim's statement of fear or intention, standing alone, as somehow reflecting on the defendant's state of mind rather than that of the victim. See *United States* v. *Brown, supra* at 766.

The Commonwealth directs our attention to *Commonwealth* v. *Weichell*, 390 Mass. 62 (1983), cert. denied, 465 U.S. 1032 (1984), asserting that that case supports its position that Sturrup's testimony that Dallas Price told her that the defendant "was back" and that "either he's going to get me or I'll have to get him" was properly admitted because that was "precisely the state of mind evidence that was properly admitted" in the *Weichell* case. *Weichell* does not support the Commonwealth's position. In *Weichell*, the court said, "We consider first whether the evidence of the victim's state of mind toward the defendant during the ten days prior to the victim's death

should be admitted in the absence of direct evidence that the defendant was even aware of the victim's hostility toward him. Such evidence is admissible only if the jury could have reasonably inferred that the defendant knew of the victim's state of mind. *Commonwealth* v. *Borodine, supra.* We conclude that the jury could so have inferred." *Id.* at 74. The *Weichell* court then set forth the evidence that the defendant knew of the victim's state of mind during the ten days before the victim's death. There is no comparable evidence in the present case. In this case, Sturrup's testimony concerning Dallas's state of mind with respect to the defendant prior to their confrontation at the Biarritz Lounge was irrelevant because there was no evidence that the defendant was aware of it.

We reach the same result with respect to Leroyal Holmes's testimony that, in the Biarritz Lounge on the night of the shooting, Dallas stated that his "worst enemy was in the bar." There was no evidence that Dallas's state of mind as reflected by that statement was known to the defendant when the shooting occurred. The evidence should not have been admitted. Also, we are content, as the Commonwealth appears to be, that the evidence concerning Dallas's state of mind presented through the testimony of Edie Price and Marie Fletcher should not have been admitted. Their testimony was admitted only to establish Dallas's state of mind — his fear — and under the *DelValle, supra,* line of cases was inadmissible.

Having concluded that the state of mind evidence we have been discussing should not have been admitted, the question before us is whether "the error[s] possibly weakened [the defendant's] case in some significant way so as to require a new trial." *Commonwealth* v. *Schulze,* 389 Mass. 735, 741 (1983). See *Commonwealth* v. *Daggett,* 416 Mass. 347, 352 n.5 (1993). The critical question is whether the court fairly can say that "the jury could not have been influenced by the [erroneously admitted evidence]." *Commonwealth* v. *Stone,* 321 Mass. 471, 474 (1947).

The only disputed issue at the trial was the identity of the gunman. An important consideration would be whether the defendant had a reason — a motive — to kill either Dallas or Tony. In his limiting instructions to the jury concerning the four witnesses' testimony as to what Dallas had told them,

the judge instructed the jury that the witnesses were permitted to testify as to what Dallas had told them "for a very limited purpose: one, as evidence of possible motive in the case . . . and also as evidence of the state of mind of [Dallas]." We cannot, therefore, be confident that the jury did not conclude, in part at least from the inadmissible evidence, that the defendant had a motive to kill Dallas and, as a result, fired into the rear seat of the Geo Tracker where Dallas and Tony Price were located.

The Commonwealth relied principally on identifications of the defendant by Holmes, Buford, and Monroe, who testified that they were familiar with the defendant. However, the credibility of these witnesses was impeached by the evidence of the witnesses' prior convictions, the existence of outstanding warrants against them at the time of the murders, and felony charges against them at the time of their testimony. Holmes had been previously convicted of carrying a firearm without a license, unlawful possession of ammunition, possession of cocaine with intent to distribute, unlawful possession of marihuana, distribution of marihuana, and conspiracy to violate the drug laws. At the time of trial, Holmes was awaiting prosecution on charges of distribution of cocaine and receiving a stolen motor vehicle.

Buford had been previously convicted on two separate occasions of possession of cocaine with intent to distribute, distribution of cocaine, unlawful possession of a firearm, and conspiracy to violate the drug laws. At the time of trial, Buford stood charged with unlawful possession of a firearm, and at least two offenses related to the possession of illegal drugs with intent to distribute.

Monroe had been previously convicted of conspiracy to violate the drug laws. At the time of trial, Monroe faced pending charges of assault and battery by means of a dangerous weapon, threats, and possession of a stolen motor vehicle. There was no physical or scientific evidence that decisively resolved the question of the killer's identity.

The defendant presented statements made by Tony Price to two police officers as he was dying from the gunman's bullets (dying declarations) that "Junior [Williams] did it." There was evidence that Dallas Price and Williams had a confrontation at the Biarritz Lounge earlier on the evening of the murders. It was also undisputed that it was Williams's Ford

Escort that turned down Palmer Street and from which, moments later, the gunman emerged.

In this context, it seems clear that the Commonwealth's case against the defendant may have been significantly enhanced by the introduction of statements made by one of the victims in the hours, days, and weeks prior to the murders expressing fear that the defendant was going to kill him. Dallas's statements that he was afraid that the defendant would kill him could have been seen by the jury as "a prophecy of what might happen to him," *United States* v. *Day*, 591 F.2d 861, 883 (D.C. Cir. 1978). His statements of fear were certainly "a voice from the grave casting an incriminating shadow on the defendant." *United States* v. *Brown*, 490 F.2d 758, 781 (D.C. Cir. 1974). The inadmissible testimony may very well have "fulfilled the broad purpose of proving that threats on the deceased's life were made by the defendant[], and the jury were left to infer from this that the defendant[] desired his death and, in fact, accomplished it." *DelValle, supra* at 492-493.

In a case quite similar to this one, *United States* v. *Brown, supra* at 762, the court considered the prejudicial effect, in a prosecution for murder, of an improperly admitted statement made by the victim to his wife prior to his death that he was frightened that the defendant would kill him. The court concluded that:

> "clearly a palpable danger exists that the jury will infer from the statement of [the victim's wife] . . . that [the victim] stated 'I am afraid I will be killed by [the defendant],' that [the defendant] was a man capable of murder, that he had done things in the past to [the victim] to justify this fear, or that [the defendant] had explicitly threatened [the victim's] life in the past. Any or all of the above conclusions are inevitably present in the jury's collective mind. Yet all such inferences insofar as they may reflect on defendant's intentions or past conduct would be improperly drawn. Moreover, the statement is extremely closely related to the issues at hand. The defendant here directly placed his identity in issue, and the challenged testimony expressly names him as the probable murderer. To the jury it must have been as simple as this: [the victim] feared being killed by [the defen-

dant], and sure enough [the victim] was killed. Therefore, odds are good that it was done by [the defendant]. Thus the danger that the statement in question would be misused by the jury on the disputed issue of identity is extremely high."

*Id.* at 778-779.

In addition to eliciting Dallas's statements from the Commonwealth's witnesses, the prosecutor referred to these statements in both her opening and closing arguments. In her closing, the prosecutor told the jury that they "had more than identification in this case. You have evidence of motive," and then recounted the testimony concerning Dallas's statements of fear of the defendant. In this case, " 'we cannot say that the evidence and the prosecutor's [use of it in her] argument did not have the effect the Commonwealth intended it to have.' *Commonwealth* v. *Reed*, 397 Mass. 440, 443 (1986)." *Commonwealth* v. *Rosa*, 412 Mass. 147, 158 (1992), *S.C.*, 422 Mass. 18 (1996). A new trial therefore is required.

The judgments are reversed, and the verdicts are set aside. The cases are remanded to the Superior Court for a new trial.

*So ordered.*