NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11805

COMMONWEALTH  vs.  WILLIAM MOSELEY.


Middlesex.     March 8, 2019. - October 3, 2019.

Present:  Gants, C.J., Lenk, Lowy, Budd, & Kafker, JJ.


Homicide.  Evidence, Hearsay, State of mind.  Practice,
    Criminal, Capital case, Hearsay, State of mind, Request for
    jury instructions, Assistance of counsel, Argument by
    counsel.



    Indictment found and returned in the Superior Court
Department on September 25, 2012.

    The case was heard by Kathe M. Tuttman, J., and a motion
for a new trial, filed on December 29, 2016, was heard by her.


    Matthew A. Kamholtz for the defendant.
    Casey E. Silvia, Assistant District Attorney (Elizabeth A.
Dunigan, Assistant District Attorney, also present) for the
Commonwealth.


    LENK, J.  In the early morning hours of August 10, 2012,

the defendant strangled to death his former girlfriend, Cecilia

Yakubu, in the bedroom of their shared apartment in Malden.  At

trial, the defendant acknowledged that he killed the victim when

he caused the tank top she was wearing to wrap around her neck. He contended, however, that the strangulation occurred unintentionally, during the course of a heated, physical struggle. The Commonwealth, by contrast, proceeded on the theory that the defendant had tightly and deliberately wrapped the tank top around the victim's neck, twice, in an effort to kill her following an argument. The only issue for the jury was the defendant's degree of culpability. The jury ultimately convicted the defendant of murder in the first degree on the theory of deliberate premeditation.

In this consolidated appeal from the conviction and from the denial of his motion for a new trial, the defendant contends that the judge erred in allowing the admission of several hearsay statements, and in declining to instruct the jury on the elements of involuntary manslaughter. Additionally, the defendant argues that his trial counsel rendered constitutionally ineffective assistance by failing to elicit testimony about the reasons why the defendant kept a knife under his pillow, and by delivering an unfocused closing argument that did not marshal the evidence in favor of a conviction of voluntary manslaughter.

For the reasons set forth infra, we affirm the defendant's conviction and the denial of his motion for a new trial. After a thorough review of the record, we discern no reason to employ

our extraordinary authority under G. L. c. 278, § 33E, to grant a new trial or to reduce the verdict.

1. Background. We recite the facts as the jury could have found them, reserving certain details for later discussion.

The victim and the defendant lived together in a two-bedroom apartment in Malden. They had been involved in a romantic relationship for approximately five years, but the relationship had begun to deteriorate. As a result, the defendant removed his belongings from the bedroom that he and the victim previously had shared and began sleeping in the second bedroom. The victim and the defendant continued this arrangement until, in August of 2012, they decided that the defendant should move out.

On the morning of August 9, 2012, the defendant packed a suitcase of his belongings and left the apartment.[1] One of his friends, Tuesday Reeves, collected the defendant from the train station; from there, they went grocery shopping. Afterward, the defendant and Reeves returned to Reeves's apartment and visited for a short time.

The defendant told Reeves that he could not return to the apartment that he had shared with the victim, and asked if he

---

[1] The victim had lunch with her friend, Dorothy O'Neal, later that day. The victim expressed her belief that the defendant had moved out of their apartment permanently.

could stay with Reeves instead.[2]  Reeves said no, and asked the defendant to leave her apartment because the man whom she was dating would be coming over later that evening.  The defendant then left Reeves's apartment and went to sell perfume oils in Cambridge, which he did occasionally to earn extra income. Later in the evening, he telephoned Reeves and asked once more if he could stay at her apartment; she again refused.  The defendant then took one of the last trains running from Cambridge to Malden that evening, and returned to the victim's apartment around 11:30 P.M.

When the defendant showed up at the apartment, the victim was using the landline telephone to speak with several of her friends.  She expressed to them her frustration that the defendant had returned, unannounced, after leading her to believe that he had moved out.

The defendant also used the landline telephone over the course of the night, primarily to speak with Reeves.  The defendant told Reeves that the victim was "going crazy" because of his return to the apartment.  He mentioned that Reeves might

---

[2] In the preceding weeks, the defendant had told Reeves about his living situation and his strained relationship with the victim; he also asked Reeves if he could move into her apartment.  Reeves had explained that it would not be permitted by the management of her public housing complex.

not see him for the next ten years, and that she should know that he loved her. He then hung up.

Reeves attempted to call back, but the victim answered. Reeves could hear the defendant in the background getting "louder and louder" as he argued with the victim; he seemed quite angry. The victim also was upset. She told Reeves that she was "sick of his shit" and that if the defendant "puts his hands on her" she would call the police. The victim also told Reeves that the defendant had to go elsewhere, preferably to Reeves's house. Reeves responded that he could not stay with her, and suggested that, instead, the victim leave the apartment. The victim did not want to leave. She ended the call shortly thereafter.[3]

The defendant subsequently went into the victim's bedroom, where the argument between them quickly escalated. The victim hit the defendant in the face with a telephone, and the defendant ripped the cord and jack out of the wall. A struggle quickly ensued. During the course of that struggle, the defendant twice wound the victim's tank top around her neck. After "a few minutes," the victim's body went limp, and she became unresponsive.

---

[3] The defendant called Reeves back a few times thereafter. During one conversation, the defendant seemed calmer. At some point, Reeves stopped answering his calls.

The defendant then went into his bedroom and, using a different landline telephone, made several calls to his mother and sister, both of whom lived in another State; those calls spanned the period of time from approximately 12:40 A.M. to 5:10 A.M.  At 5:15 A.M., approximately four to five hours after the victim had died, the defendant telephoned 911 and reported that he had "just killed [his] wife. . . .  She's dead."  He told the 911 operator that he would be waiting outside the apartment for police to arrive.

When the first police officer responded, the defendant told him that he had "just killed [his] wife," and that he had "strangled her."  Police entered the apartment to find the victim lying face down on the floor of the bedroom in a small pool of blood; a black tank top was wrapped tightly around her neck, and a telephone cord was draped across her shoulders.  One of the officers tried to find a pulse on the victim's neck, but the tank top was wrapped too tightly and the officer could not get his fingers underneath it.  He instead checked for a pulse on the victim's wrist and found none.[4]

---

[4] Because rigor mortis had begun to set in, the medical examiner believed that the victim had been dead at least one hour; by the defendant's own statement at trial, she had been dead approximately four to five hours.

An autopsy subsequently revealed that the victim had several abrasions on the side of her neck that were consistent with efforts to remove the tank top before she lost consciousness.  The victim also had several bruises and scratches on her body that were consistent with having been struck.[5]

At trial, the only contested issue was whether the ligature strangulation had occurred deliberately or inadvertently.  The Commonwealth argued that the defendant tightly wrapped the victim's tank top around her neck, twice, in order to kill her. The defendant testified that his hand inadvertently became caught up in the victim's tank top during a struggle; he then pulled it back in order "[t]o restrain her," but the victim became unresponsive and limp shortly thereafter.[6]

---

[5] The defense expert agreed that the bruising was consistent with a fist striking the victim, but testified also that it could be consistent with a collapse injury due to, for example, a fall to the floor after losing consciousness.

[6] The medical examiner demonstrated on a mannequin the manner in which the ligature had been wound around the victim's neck, and how the strangulation likely occurred.  The mannequin was admitted in evidence, and the jury took it into the deliberation room.

After a six-day trial, the jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation.[7]

2. Discussion. In this consolidated appeal from his conviction and from the denial of his motion for a new trial, the defendant argues that the judge erred in allowing the admission of several hearsay statements by the victim to others on the night that she was killed. He maintains also that the judge erred in not instructing the jury on the elements of involuntary manslaughter. The defendant argues that his trial counsel was ineffective because counsel failed to elicit testimony from the defendant regarding the reasons why he kept a knife under his pillow, and delivered a "rambling" and unpersuasive closing argument that did not convince the jury to convict the defendant of voluntary manslaughter, rather than murder. Should we conclude that none of these asserted errors warrants a new trial, the defendant also requests that we grant relief pursuant to G. L. c. 278, § 33E, by reducing the verdict to murder in the second degree.

a. Victim's statements. The judge allowed the Commonwealth to introduce several statements made by the victim to her friends and to Reeves on the day and night that she was

---

[7] The jury did not convict the defendant on the theory of extreme atrocity or cruelty.

killed.  Although the judge offered to provide a limiting instruction, the defendant expressly declined one.[8]

The defendant argues that these statements should not have been admitted because they constituted hearsay and were unduly prejudicial insofar as they might have demonstrated the victim's fear of the defendant.  The Commonwealth maintains that the statements were not hearsay, as they were admitted not for their truth but for the purpose of demonstrating the victim's state of mind, which was made known to the defendant and shed light on his motive on the night of the killing.  "Generally, determinations as to the admissibility of evidence lie 'within the sound discretion of the trial judge.'"  Commonwealth v. Bins, 465 Mass. 348, 364 (2013), quoting Commonwealth v. Jones, 464 Mass. 16, 19-20 (2012).

---

[8] Defense counsel objected to the introduction of each respective statement, but he did not request a limiting instruction.  Counsel told the judge that his decision was tactical, as he believed that a limiting instruction would serve only to place a judicial imprimatur on the victim's statements and the inferences to be drawn therefrom.  We discern no ineffective assistance resulting in a substantial likelihood of a miscarriage of justice from this decision, particularly in light of the overwhelming evidence of the defendant's guilt.  See Commonwealth v. Franklin, 465 Mass. 895, 914 (2013) (failure to request instruction not ineffective assistance resulting in substantial likelihood of miscarriage of justice); Commonwealth v. Griffith, 404 Mass. 256, 263 (1989) (counsel's tactic not ineffective "[c]onsidering the overwhelming evidence against the defendant").

The first of the challenged conversations was with Sharon Phillips.  Phillips testified, in relevant part, that the victim said, "He's back," when the defendant returned to the apartment that evening.  The second was with Stanley Blidgen; he testified to his conversation with the victim earlier that day, in which the victim expressed her understanding that the defendant had left the house with a suitcase and had moved out.  The third exchange took place with a long-time friend of the victim, Dorothy O'Neal.  O'Neal testified that the victim told her that the defendant "was gone" and "that he took a little red bag." O'Neal inquired if the victim had retrieved her key from the defendant, to which she responded, "No, he's gone."  The fourth challenged conversation was with Tuesday Reeves that evening. She testified:

Q.:  "What was the conversation?"

A.:  "She was upset.  [The defendant] was making a sandwich. . . .  She said that he was in there taking food when he didn't put any food in her house, and that he needed to come to my house."

Q.:  "Did you have a response to that?"

A.:  "Yes, I told her that I have a guy and he cannot come here."

Q.:  "What else did she say to you?"

A.:  "She said to me that if he puts his hands on her that she would call the police."

Q.:  "Did she say anything about how she felt about him?"

A.:  "Yes, she said that she was sick of his shit."

. . .

Q.:  "And we're not going to get into what you said, but you gave her some advice?"

A.:  "Yes, I did."

. . .

A.:  "I told her to leave.  I told her to get out of the house, to leave."

Q.:  "And she said no."

A.:  "She said, no, it was her house."

Q.:  "And when you're having this conversation with her, can you hear anybody in the background?"

A.:  "Yes, I can.  I could hear [the defendant]."

In certain circumstances, statements made by a victim to a third party may be admissible as evidence "of a murder victim's state of mind as proof of the defendant's motive to kill the victim."  See Commonwealth v. Castano, 478 Mass. 75, 85 (2017), citing Commonwealth v. Qualls, 425 Mass. 163, 167 (1997), S.C., 440 Mass. 576 (2003).  See also Mass. G. Evid. §§ 801(c), 802 (2019).  A victim's statements, however, may be admissible only if "there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it."  Castano, supra, quoting Qualls, supra.  See Commonwealth v. Magraw, 426 Mass. 589, 593-594 (1998).  "There need not be direct evidence that the defendant learned of the

victim's state of mind, so long as the jury reasonably could have inferred that he or she did learn of it." Castano, supra.

Here, the statements made by the victim to others in the hours before her death were probative of her state of mind on the night that she was killed, that is, the victim's ongoing dissatisfaction with the relationship, her frustration with the defendant's presence in the apartment after believing that he had moved out, and the defendant's response to her annoyance when confronted. Compare Castano, 478 Mass. at 85-86 (desire to terminate relationship and have defendant move out of shared apartment sufficient for jury to infer motive); Commonwealth v. Tassinari, 466 Mass. 340, 347 (2013) (victim's statements to others regarding desire that defendant move out demonstrated ongoing hostility and discord within relationship); Commonwealth v. Borodine, 371 Mass. 1, 7-9 (1976), cert. denied, 429 U.S. 1049 (1977) (victim's statements to third parties about deterioration of relationship relevant in assessing defendant's motive to kill victim).[9]

---

[9] Although the Commonwealth is not required to prove a defendant's motive for committing a particular crime, if there is evidence of motive, that evidence may be admissible. See Commonwealth v. Borodine, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977). Evidence of a victim's fear of a defendant, however, "is not admissible at all to prove motive." See Commonwealth v. Magraw, 426 Mass. 589, 594 (1998). Here, the victim's statements did not indicate her fear of the defendant but, rather, her irritation, anger, and annoyance at his return, and her dissatisfaction with the state of their

Moreover, the jury could have inferred that the defendant was aware of the victim's state of mind at the time of the crime, as expressed to her friends, to Reeves, and to the defendant, which may have shed light on the defendant's intent or motive to harm the victim. See Castano, 478 Mass. at 85-86. Indeed, Reeves testified that she heard the defendant in the background when the victim was expressing her irritation at the defendant's presence in the apartment and his lack of financial contribution to household expenses, her thoughts of calling the police if he "put[] his hands on" her, and her request that he leave. Further, by the defendant's own testimony at trial, the victim had in fact confronted him; their argument then led to a physical struggle, which ended with the defendant strangling the victim. Compare id. at 85 (adequate evidence for jury to infer that defendant knew of victim's state of mind where, in defendant's own description of killing, "he and the victim were arguing in the moments leading up to it").[10]

The relatively innocuous statements also cannot be said to have been unduly prejudicial to the defendant, as they reference

---

relationship and living situation. Cf. Commonwealth v. Qualls, 425 Mass. 163, 169 (1997) (evidence of victim's fear does not shed light on defendant's motive, even if defendant knew of that fear).

[10] To the extent that the statements also may have included remarks made by a third party to the victim, those statements were not introduced for their truth. See Commonwealth v. Bins, 465 Mass. 348, 365 (2013).

neither the victim's fear of the defendant nor any misconduct on the part of the defendant. Cf. Qualls, 425 Mass. at 169. Thus, in light of the relevance of the victim's statements, the defendant's awareness of her state of mind, and the broad latitude afforded to a judge's decision to allow the admission of such evidence if it is not unduly prejudicial, see L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), we discern no error in allowing the statements to be introduced at trial. See Bins, 465 Mass. at 365-366 (no error in allowing admission of victim's statements where it was within judge's sound discretion to do so).

b. Instruction on involuntary manslaughter. At the close of all the evidence, the defendant requested instructions on involuntary and voluntary manslaughter. The judge declined to instruct on involuntary manslaughter, but agreed to provide an instruction on voluntary manslaughter, in light of evidence that could have supported a theory of heat of passion induced by sudden combat. See Commonwealth v. Espada, 450 Mass. 687, 694 (2008). The judge also instructed on murder in the second degree and murder in the first degree. The defendant maintains in this appeal that the judge erred in declining to instruct the jury on involuntary manslaughter.

"Involuntary manslaughter is an unintentional killing resulting from 'wanton and reckless conduct . . . [or] . . . a

battery not amounting to a felony which the defendant knew or should have known endangered human life." Commonwealth v. Tague, 434 Mass. 510, 517-518 (2001), cert. denied, 534 U.S. 1146 (2002), quoting Commonwealth v. Pierce, 419 Mass. 28, 33 (1994). "An instruction on involuntary manslaughter is required where any view of the evidence would permit a finding of manslaughter and not murder." Pierce, supra. "When it is obvious, however, that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required." Id. In determining whether such an instruction was warranted, "we consider the evidence in a light most favorable to the defendant." Tague, supra at 518.

The evidence in this case, taken in the light most favorable to the defendant, did not entitle him to an instruction on involuntary manslaughter. While the defendant's hands may have inadvertently gotten caught up in the victim's tank top during their struggle, by the defendant's own testimony at trial, he then "pulled" the tank top in order "[t]o restrain her," while she was clawing at her neck in an effort to release the ligature. The defendant continued to do so, by his own estimate, for "a few minutes," until the victim had stopped struggling. The obvious risk of physical harm associated with the continued pulling of a ligature around the victim's neck, so

tightly that she could not remove it despite her efforts, created a "plain and strong likelihood that death would follow." See Commonwealth v. Degro, 432 Mass. 319, 331 (2000). See also Commonwealth v. DeMarco, 444 Mass. 678, 684 (2005) (involuntary manslaughter instruction not warranted where defendant choked, strangled, and slammed victim on ground); Commonwealth v. Fitzmeyer, 414 Mass. 540, 547-548 (1993) (involuntary manslaughter instruction not warranted where defendant choked and beat victim); Commonwealth v. Garabedian, 399 Mass. 304, 315-316 (1987) (involuntary manslaughter instruction not warranted where defendant strangled victim with drawstring from his jacket and threw rocks at her).

Moreover, the defendant strangled the victim with sufficient force so as to cut off the flow of oxygen to her brain, causing hemorrhaging in her face and eyes. When she became unresponsive and limp, he left the victim alone -- either unconscious or dead -- with the ligature still wrapped tightly around her neck. When he realized that the victim was dead, the defendant did not call for emergency assistance until approximately four or five hours had passed. In analogous circumstances, we have concluded that the evidence did not warrant an instruction on involuntary manslaughter. Cf. Commonwealth v. Felix, 476 Mass. 750, 760 (2017) (involuntary manslaughter instruction not warranted where defendant placed

ligature around victim's neck and pulled with force for three to five minutes); Commonwealth v. Linton, 456 Mass. 534, 552-553 (2010) (involuntary manslaughter instruction not warranted where defendant used manual force in strangling victim for at least ninety seconds, did not call for emergency aid, and left victim unconscious or dead behind locked door).

Because an involuntary manslaughter instruction was not reasonably supported by the evidence in light of the "plain and strong likelihood that death [would] follow" from the defendant's having pulled the tank top around her neck for several minutes, see Pierce, 419 Mass. at 33, we discern no error in the judge's decision not to provide one.  See Commonwealth v. Nardone, 406 Mass. 123, 132 (1989) ("judge should not instruct a jury on a lesser-included offense not suggested by a reasonable view of the evidence").

c.  Ineffective assistance of counsel.  The defendant also moved for a new trial on the grounds that his trial counsel rendered constitutionally ineffective assistance by introducing, and then not explaining, the evidence that the defendant kept a knife under his pillow, and by delivering an incoherent closing argument.  The motion judge, who was also the trial judge, denied the motion, from which the defendant now appeals.  We review that decision for "a significant error of law or other abuse of discretion," and afford "special deference to the

rulings of a motion judge who was also the trial judge" (citation omitted). See Commonwealth v. Alcide, 472 Mass. 150, 158 (2015). "When we review such a decision in the context of an appeal from a conviction of murder in the first degree, the defendant nevertheless 'has the benefit of our independent review, pursuant to G. L. c. 278, § 33E . . . of the entire record.'" Id., quoting Commonwealth v. Carter, 423 Mass. 506, 513 (1996).

In evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, we review to determine "whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel." See Commonwealth v. Walker, 460 Mass. 590, 598 (2011); Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014). In so doing, we need not consider whether counsel's action "fell measurably below the conduct expected from an ordinary fallible lawyer, but determine instead whether there was error and, if so, whether the error was likely to have influenced the jury's conclusion" (quotations and citation omitted). See Commonwealth v. Franklin, 465 Mass. 895, 909 (2013).

i. Failure to elicit testimony. Prior to trial, the Commonwealth filed a motion in limine seeking to exclude

evidence that the defendant had kept a knife under his pillow.[11] The defendant sought to elicit this evidence because he believed it would indicate that the defendant had a fear of the victim. The judge denied the Commonwealth's motion to exclude this evidence, but stated that the defendant could not argue that he feared the victim unless additional evidence were to be introduced to support such an inference. The defendant subsequently testified, but his counsel did not ask him any questions about the knife under his pillow.[12]

In the defendant's motion for a new trial, the judge determined that an inadvertent failure by counsel to elicit testimony about the knife likely constituted error. She noted, however, that "ineffective assistance is not established simply by showing that trial counsel failed to offer certain evidence." See Commonwealth v. Medina, 20 Mass. App. Ct. 258, 261 (1985). Indeed, courts must determine whether any such error was "likely to have influenced the jury's conclusion" (citation omitted). Franklin, 465 Mass. at 909.

Having conducted an independent review of the entire trial record, we agree with the motion judge that any testimony about

---

[11] The victim's landlord had discovered the knife when he was cleaning out the apartment after the victim's death, and gave it to investigating officers.

[12] Trial counsel asserted in an affidavit in support of the defendant's motion for a new trial that the omission was inadvertent.

the defendant's possible fear of the victim was unlikely to have influenced the jury's conclusion. This is particularly true in light of what she deemed to be powerful evidence of deliberate premeditation arising from the medical examiner's demonstration of the ligature strangulation on a mannequin and the defendant's admissions at trial. Moreover, any testimony about the knife appears immaterial to the defense theory that the defendant either had inadvertently wrapped the ligature around the victim's neck or had strangled the victim in a heat of passion during mutual combat. Eliciting any further testimony about the reasons why the defendant kept a knife under his pillow thus would be unlikely to have bolstered the defense; by contrast, it could have served to undermine the defense that the defendant did not plan or intend to kill the victim. See Commonwealth v. Montez, 450 Mass. 736, 754-755 (2008) (no ineffective assistance where additional testimony would have undermined defense).[13]

Any passing reference to the existence of a knife at trial also was brief and insubstantial. Neither the prosecutor nor defense counsel made reference to the knife in their arguments, and mention of the knife formed only a very small portion of the

---

[13] The jury also were instructed that they could not engage in any guesswork, conjecture, or speculation about the evidence. We presume, as we must, that the jury heeded those instructions and did not impermissibly speculate about the knife. See Commonwealth v. Rivera, 482 Mass. 259, 271 (2019).

testimony; it thus likely had but very slight effect on the jury. In light of the overwhelming evidence of the defendant's guilt, we are confident that even if counsel had fully developed this evidence at trial, it would not have influenced the jury's conclusion that the defendant intended to strangle the victim. As such, we discern no substantial likelihood of a miscarriage of justice. See Commonwealth v. Facella, 478 Mass. 393, 411 (2017) (failure to elicit evidence at trial not ineffective assistance resulting in miscarriage of justice "[g]iven the overwhelming evidence of the defendant's guilt"); Commonwealth v. Griffith, 404 Mass. 256, 263 (1989) (counsel's tactics not ineffective assistance "[c]onsidering the overwhelming evidence against the defendant"). We discern no error in the judge's denial of the motion for a new trial on this basis.

ii. Closing argument. The defendant maintains also that his counsel rendered ineffective assistance by delivering an unfocused closing argument that failed to marshal the evidence in favor of a conviction of voluntary manslaughter.

While counsel's argument did include several irrelevant anecdotes and references to popular culture,[14] any such remarks

_____

[14] For example, counsel made references to his own experience serving on a jury, as well as the advice provided by other judges whom he admired on the role of the jury. Counsel also included anecdotes about his children, astronauts, and celebrities. The judge characterized the closing argument as

must be "considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." See Commonwealth v. Nieves, 429 Mass. 763, 772 (1999). Indeed, the "guaranty of the right to counsel is not an assurance to defendants of brilliant representation or one free of mistakes." Commonwealth v. Kolenovic, 478 Mass. 189, 196 (2017), quoting Commonwealth v. LeBlanc, 364 Mass. 1, 13-14 (1973).

Considering the closing argument as a whole, this is not a case in which counsel's argument abandoned the theory of the case or failed effectively to argue that theory, leaving the client "denuded of a defense." Commonwealth v. Street, 388 Mass. 281, 287 (1983). Nor it is a case in which counsel's statements were "tantamount to an admission of his client's guilt." Commonwealth v. Triplett, 398 Mass. 561, 569 (1986). Rather, counsel here touched upon all of the relevant evidence that could have supported a verdict of voluntary manslaughter as opposed to murder. Specifically, counsel noted,

> "[T]here will be an instruction that you can consider whether or not the defendant is guilty of the crime of voluntary manslaughter. That this was sudden combat and that the death resulted from his actions during -- after this sort of hot blood provocation, things of that particular nature. [The victim] hits him with the phone, they struggle. [The defendant] says they're both throwing punches, landing punches,

displaying counsel's "folksy, salt-of-the-earth" style, in which he was "trying to connect on a personal level with the jurors."

> they're on the floor.  He gets up.  He says he reaches
> around probably grabs her shirt.  But to do this, to
> really know that this is what's going to result is
> death I would suggest would take some specialized
> knowledge that he doesn't have."

Counsel concluded by saying it was "not even clear . . . that [the defendant] had the intent to kill out of this provocation," and urged the jury that "when you apply all the law[,] the duty to return the verdict that best fits the facts of this case . . . [is] voluntary manslaughter."

The defendant also critiques counsel's performance by pointing to an alternative use of the facts that might have better persuaded the jury.  "A list of subjective critiques of defense counsel's [performance], absent a showing that errors likely affected the jury's conclusions," however, "is insufficient to support an ineffective assistance claim."  See Commonwealth v. Degro, 432 Mass. 319, 333 (2000), quoting Commonwealth v. Scott, 428 Mass. 362, 369 (1998).  Indeed, "[i]t is far too easy to examine a transcript and point to ways to 'do it better.'"  Degro, supra.  Several statements in counsel's closing, although perhaps interposed with personal stories, focused on the theory of the defense:  that the defendant had not acted with premeditation, but had strangled the victim in

the heat of passion.  "This was a reasonable choice, in the face of overwhelming evidence of guilt."  See id.[15]

We thus discern no substantial likelihood of a miscarriage of justice on the basis of counsel's closing argument, and no abuse of discretion in the denial of the defendant's motion for a new trial.

d.  Relief pursuant to G. L. c. 278, § 33E.  The defendant also requests that this court exercise its authority to reduce the verdict to murder in the second degree, particularly in light of the unplanned nature of the attack.[16]  We decline, however, to disturb the jury's verdict that the defendant

---

[15] Counsel also had to make his closing argument in light of the defendant's testimony that he had pulled the tank top around the victim's neck in order to restrain her and the defendant's cryptic statement to Reeves that she should not expect to see him for the next "ten years."  These statements, indicating a possible plan to harm grievously the victim, were difficult to overcome.  So, too, were the defendant's statements to a police officer that he had strangled the victim, and his testimony at trial that the strangulation lasted a "few minutes." Nonetheless, counsel presented the defense theory of the case with reference to the critical facts and testimony in support thereof.  Cf. Commonwealth v. Marrero, 459 Mass. 235, 246 (2011) (affirming conviction where "several, and perhaps even all, of the statements" made in closing were improvident).

[16] More specifically, the defendant requests a reduction in the verdict because he has a limited education, see Commonwealth v. McDermott, 393 Mass. 451, 460 (1984); the attack was unplanned and senseless, see Commonwealth v. Pagan, 471 Mass. 537, 543, cert. denied, 136 S. Ct. 548 (2015); he did not bring a weapon to the scene, see Commonwealth v. King, 374 Mass. 501, 507 (1978); and there was no history of animosity or confrontation between him and the victim, see Commonwealth v. Ransom, 358 Mass. 580, 583 (1971).

strangled the victim to death with deliberate premeditation, which was supported by ample evidence.  Compare Commonwealth v. Mejia, 461 Mass. 384, 393 (2012) ("evidence of death by manual strangulation sufficient to establish malice and deliberate premeditation"); Commonwealth v. Serino, 436 Mass. 408, 411 (2002) (evidence of premeditation inherent in method of death through sustained pressure to victim's neck).  Pursuant to our duty under G. L. c. 211, § 3, we have thoroughly reviewed the entire trial record and discern no other reason to grant a new trial or to reduce the verdict.

3.  Conclusion.  For the foregoing reasons, we affirm the judgment of conviction.  The order denying the defendant's motion for a new trial is also affirmed.

So ordered.